Jonathan D. MAURO, Plaintiff–
Appellant,

v.

Joseph M. ARPAIO, Sheriff; Maricopa
County, a political subdivision of the
State of Arizona, Defendants–Appel-
lees.

No. 97–16021.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 25, 1999

Filed Aug. 17, 1999

---

Nicholas S. Hentoff, Phoenix, Arizona, for the plaintiff-appellant.

Daniel P. Struck and David C. Lewis, Jones, Skelton & Hochuli, Phoenix, Arizona, for the defendants-appellees.

Before: HUG, Chief Judge, SCHROEDER, FLETCHER, BRUNETTI, FERNANDEZ, RYMER, T.G. NELSON, KLEINFELD, TASHIMA, THOMAS and WARDLAW, Circuit Judges.

Opinion by Judge T.G. NELSON; Dissents by Judge SCHROEDER, FLETCHER and KLEINFELD.

T.G. NELSON, Circuit Judge:

This case concerns the constitutionality of a policy issued by Joseph M. Arpaio, in his capacity as Maricopa County Sheriff, prohibiting inmates from possessing "sexually explicit material." Jonathan Mauro, an inmate in the Maricopa County jail system, filed an action under 42 U.S.C. § 1983 claiming that the policy infringed on his First Amendment rights. Because we conclude that the policy is reasonably related to legitimate penological interests, we hold that the policy is a valid restraint on Mauro's First Amendment rights.

I.

The Maricopa County jail system is one of the country's largest, housing 6500 inmates at any given time. The average inmate stay is slightly less than fourteen days. Until 1993, the jail had no policy restricting possession of sexually explicit materials.

Prior to adoption of the policy challenged by Mauro, female detention officers were faced with situations in which male inmates compared the officers' anatomy to that of nude women depicted in various publications, often *Playboy* magazine centerfolds. The officers would be invited to look at the breasts on these nude models, or asked their opinion about shaved genitalia. The officers would also encounter inmates who were openly masturbating while looking at sexually explicit pictures. One inmate told an officer that he was mentally having anal intercourse with Miss July, and when he was done, he was going to do the same to the officer. The officers were confronted with this type of behavior often, ranging from several times daily to several times a week.

In response to this problem, on August 6, 1993, the jail administration instituted a policy which prohibited inmates from possessing "sexually explicit materials." The notice to the inmates only included the prohibition on sexually explicit materials, while the accompanying notice to jail employees defined "sexually explicit materials" as "materials that show frontal nudity" including "personal photographs, drawings, and magazines and pictorials that show frontal nudity." Pursuant to the policy, sexually explicit materials found in the possession of inmates are confiscated and destroyed.

Implementation of the policy resulted in a sharp decrease in the number of problems encountered by the female officers. The officers reported that the situations declined to only happening to them occasionally, if at all. Also, from August 1993, when the policy was implemented, until August 1995, no inmate had requested au-

thorization to receive and possess sexually explicit materials that are prohibited under the policy.

Jonathan D. Mauro was incarcerated in the Maricopa County jail system as a pretrial detainee in August 1995. He requested that he be allowed to receive a *Playboy* magazine, which was denied pursuant to the policy. He filed suit under 42 U.S.C. § 1983 against Maricopa County and its sheriff, Joseph Arpaio, claiming that the policy infringed his rights under the First Amendment.

The district court granted the defendants' motion for summary judgment and Mauro appealed. A panel of this court reversed. *See Mauro v. Arpaio*, 147 F.3d 1137 (9th Cir.1998). The panel opinion was withdrawn when this court voted to rehear the case en banc. *See Mauro v. Arpaio*, 162 F.3d 547 (9th Cir.1998).

## II.

█ We begin our discussion with a review of two basic and potentially competing principles that necessarily frame our analysis of Mauro's constitutional claim. The first of these principles is that prisoners are not stripped of the protections of the Constitution upon incarceration. *See Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Thus, "when a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect [prisoners'] constitutional rights." *Id.*

█ The second basic principle that frames our analysis is that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Id.*

> [T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration

is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities.

*Id.* at 84–85, 107 S.Ct. 2254 (citations omitted).

█ To maintain the necessary balance between these two basic principles, we must apply a deferential standard of review to challenges regarding prison regulations and uphold the regulation "if it is reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. 2254.

> [S]uch a standard is necessary if prison administrators, and not the courts, are to make the difficult judgments concerning institutional operations. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision-making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby unnecessarily perpetuating the involvement of the federal courts in affairs of prison administration.

*Id.* (citations, quotations and ellipses omitted).

## III.

█ To determine whether the jail's policy of excluding all material containing frontal nudity "is reasonably related to legitimate penological interests," and therefore valid, we must consider four factors: (1) whether there is a valid, rational connection between the policy and the legitimate governmental interest put for-

ward to justify it; (2) whether there are alternative means of exercising the right; (3) whether the impact of accommodating the asserted constitutional right will have a significant negative impact on prison guards, other inmates and the allocation of prison resources generally; and (4) whether the policy is an "exaggerated response" to the jail's concerns. *See id.* at 89–90, 107 S.Ct. 2254; *Casey v. Lewis,* 4 F.3d 1516, 1520 (9th Cir.1993).

## A. *Rational Connection*

■■■ The first factor we must consider is whether there is a rational connection between the challenged policy and a legitimate governmental interest. *See Turner,* 482 U.S. at 89, 107 S.Ct. 2254. This requires us to determine whether the governmental objective underlying the policy is (1) legitimate, (2) neutral, and (3) whether the policy is "rationally related to that objective." *Thornburgh v. Abbott,* 490 U.S. 401, 414, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

■■■ The jail's policy of excluding sexually explicit materials is expressly aimed at maintaining jail security, rehabilitating inmates and reducing sexual harassment of female detention officers. It is beyond question that both jail security and rehabilitation are legitimate penological interests.[1] *See id.* at 415, 109 S.Ct. 1874 (prison security); *Turner,* 482 U.S. at 91, 107 S.Ct. 2254 (prison security); *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (rehabilitation); *Procunier v. Martinez,* 416 U.S. 396, 413–14, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (prison security, order and rehabilitation). More-

over, although no court has addressed whether reducing sexual harassment of prison employees is a legitimate penological interest, there is no doubt that protecting the safety of guards in general is a legitimate interest, and that reducing sexual harassment in particular likewise is legitimate.[2] *See Folkerson v. Circus Circus Enters., Inc.,* 107 F.3d 754, 756 (9th Cir. 1997) (holding that employer may be liable for failing to prevent sexual harassment of employee by co-workers and by private individuals, such as business patrons).

The requirement that the policy be "neutral" is also unquestionably met in this case. As the Court explained in *Thornburgh,* to meet *Turner*'s "neutrality" test,

> the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are "neutral" in the technical sense in which we meant and used that term in *Turner.*

490 U.S. at 415–16, 109 S.Ct. 1874 (quotations and citation omitted).

Here, as in *Thornburgh,* the jail administrators drew a distinction between materials solely on the basis of the materials' potential effect on the prison's legitimate objectives. The regulations are therefore "neutral" in the technical sense required under *Turner* and *Thornburgh. See* 490 U.S. at 415–16, 109 S.Ct. 1874; *Amatel v. Reno,* 156 F.3d 192, 197–98 (D.C.Cir.1998); *Dawson v. Scurr,* 986 F.2d 257, 261 (8th Cir.1993).

1. The jail houses a mix of pretrial detainees and convicted inmates. The jail's goal of rehabilitation is a legitimate goal only to the extent that it applies to the convicted inmates housed at the jail. It is not a legitimate goal to the extent that the jail is attempting to impose rehabilitation on the pretrial detainees housed at the jail. *See United States v. Hearst,* 563 F.2d 1331, 1345 n. 11 (9th Cir.1977) ("[A] pretrial detainee may assert his status as a shield against intrusive practices aimed solely at rehabilitation but not against practices aimed at security and discipline.")

2. In his dissent, Judge Kleinfeld maintains that there is a genuine issue of material fact regarding whether the jail's policy of excluding sexually explicit materials was imposed for the purpose of punishing pretrial detainees. This issue was not raised by the parties in their briefs before this court. The issue has therefore been waived. *See Stivers v. Pierce,* 71 F.3d 732, 740 n. 5 (9th Cir.1995) (holding that parties waived issue by failing to raise it in their briefs).

■ Finally, the requirement that the policy be rationally related to the jail's legitimate objectives is met in this case. To show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove that the banned material actually caused problems in the past, or that the materials are "likely" to cause problems in the future. *See Thornburgh,* 490 U.S. at 417, 109 S.Ct. 1874; *Casey,* 4 F.3d at 1521. Moreover, it "does not matter whether we agree with" the defendants or whether the policy "in fact advances" the jail's legitimate interests. *See Amatel,* 156 F.3d at 199. The only question that we must answer is whether the defendants' judgment was "rational," that is, whether the defendants might reasonably have thought that the policy would advance its interests. *See id.*

The relationship between the possession of sexually explicit materials and the problems sought to be addressed by the policy-sexual harassment of female officers, jail security and rehabilitation of inmates-is clear. In the past,[3] inmates have used nude photographs to draw anatomical comparisons with the wives, girlfriends and mothers of other inmates, which in turn led to fights and disturbances by the inmates and created a security risk for both inmates and jail employees; to draw anatomical comparisons between the female detention officers and the persons depicted in the photographs; and to openly masturbate in front of and otherwise sexually harass the female officers.

■ The relationship between the jail's policy of prohibiting the possession of sexually explicit materials and the goals of preventing sexual harassment of the female officers, inmate rehabilitation and maintenance of jail security is not so "remote as to render the policy arbitrary or irrational."[4] *See Turner,* 482 U.S. at 89–90, 107 S.Ct. 2254; *Amatel,* 156 F.3d at 200–01; *Dawson,* 986 F.2d at 261 (holding regulation restricting access to sexually explicit materials is rationally related to goals of prison security and inmate rehabilitation). Although, as the defendants candidly admit, the "fit" between the policy and the jail's objectives is not "exact," an exact fit is not required. Rather, all that is required is that there be a "rational" connection between the policy and the jail's legitimate objectives. This standard is met.[5]

3. Although it is not required that prison officials be able to show that the prohibited materials have actually caused problems in the past, *see Casey,* 4 F.3d at 1521, their ability to do so certainly strengthens their case.

4. That the jail policy may exclude artistic or scientific journals does not render the policy unconstitutionally overbroad. As the Court held in *Thornburgh,* a prison regulation does not need to pass the "least restrictive alternative test" to withstand constitutional challenge. *See* 490 U.S. at 414, 109 S.Ct. 1874. Rather, as long as the regulation withstands the *Turner* reasonableness test, it will be deemed constitutional. *See id.*

Moreover, as the district court found:

[I]t is not "so remote" a possibility for prisoners to barter nude photographs or drawings in artistic and scientific magazines, to use such photographs to draw anatomical comparisons with the wives or girlfriends of other inmates, and to use such photos to sexually harass female detention officers. In fact, the court finds no marked distinction between plaintiff's

Exhibit 1, depicting a live nude female model on the cover of an art magazine, and a photograph of a nude female model in *Playboy.*

Finally, it is interesting to note that one of the very publications that Mauro points to in support of his claim that the policy is "overbroad"-*National Geographic*-is available in the jail library. In fact, Mauro has been unable to document a single instance in which a prisoner's request for a copy of *National Geographic,* or any other "scientific" publication, has been refused because of content.

5. We reject Mauro's argument that the policy is not "rationally related" because it gives jail employees "unbridled discretion." As the Court made clear in *Thornburgh,* regulations which give broad discretion to prison authorities are appropriate where the regulations concern materials *coming into* a prison. *See* 490 U.S. at 416, 109 S.Ct. 1874. Moreover, rather than giving jail employees unbridled discretion, as Mauro contends, the policy actually grants little, if any, discretion to jail

## B. Alternative Avenues

■ The second factor we must consider in determining the reasonableness of the policy's restriction on constitutional rights is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner,* 482 U.S. at 90, 107 S.Ct. 2254. "Where 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" *Id.* (citations omitted).

■ In applying this factor, "the right in question must be viewed sensibly and expansively." *Thornburgh,* 490 U.S. at 417, 109 S.Ct. 1874 (quotations omitted). For example, in *Turner,* the Court upheld a regulation that restricted correspondence between inmates at different state prisons. In doing so, the Court rejected the argument that inmates should be afforded other means of communicating with inmates at other institutions, finding it sufficient if other means of *expression* remained available to the inmates. *See Turner,* 482 U.S. at 92, 107 S.Ct. 2254.

Similarly, in *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the Court upheld a regulation that restricted inmates' ability to attend the Jumu'ah, a Muslim religious ceremony, finding it sufficient if the inmates were permitted to participate in other Muslim religious ceremonies. *See id.* at 351–52, 107 S.Ct. 2400. Finally, in *Thornburgh,* the Court upheld a regulation restricting the incoming publications that inmates could receive and possess, finding sufficient alternative means available to the inmates because the regulations permitted "a broad range of publications to be

sent, received, and read." *See Thornburgh,* 490 U.S. at 417–18, 109 S.Ct. 1874; *see also Amatel,* 156 F.3d at 201.

We agree with the district court that a sensible and expansive view of the constitutional right infringed by the jail's policy is the "right to receive sexually explicit communications." Viewed in this sensible and expansive manner, there are many alternative means available to the inmates. As the district court recognized, although the policy bans all sexually explicit materials depicting frontal nudity, it does not ban sexually explicit letters between inmates and others, nor does it ban sexually explicit articles or photographs of clothed females. *See Amatel,* 156 F.3d at 202 ("[T]he regulation by its terms only restricts pictures; a prisoner may *read* anything he pleases.")

## C. Impact on Others

■ The third factor that we must address is the impact that accommodation of the asserted constitutional right would have on prison personnel, other inmates, and the allocation of prison resources. *See Turner,* 482 U.S. at 90, 107 S.Ct. 2254. This factor requires us to determine the impact of allowing inmates unrestricted access to sexually explicit materials. *See id.* at 92, 107 S.Ct. 2254.

The impact of such unrestricted access would be significant. As discussed previously, such access could lead to the bartering of sexually explicit materials and anatomical comparisons which could in turn lead to fights between inmates. These fights jeopardize not only the safety of jail employees, but also other inmates.

Moreover, as also previously discussed, allowing inmates unlimited access to sexually explicit materials would expose the

employees. Under the policy, *all* materials containing frontal nudity are prohibited. Thus, jail employees must simply determine whether the material in question contains frontal nudity; if it does, it is prohibited under the policy.

We also reject Mauro's argument that the policy is unconstitutionally "vague." By ex-

cluding all materials containing frontal nudity, the policy sets out a bright-line rule. This bright-line rule not only limits the discretion available to jail employees, but also ensures consistency in the exclusion of materials. There is nothing vague about this policy.

female detention officers, whose complaints originally led to the adoption of the policy, to sexual harassment and a hostile work environment. "Where, as here, the right in question 'can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike,' [we] should defer to the 'informed discretion of corrections officials.'" *Thornburgh*, 490 U.S. at 418, 109 S.Ct. 1874 (quoting *Turner*, 482 U.S. at 90–92, 107 S.Ct. 2254).

### D. *Exaggerated Response*

 The fourth and final factor that we must address is whether the policy is an exaggerated response to the jail's concerns.

> [T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an *inmate* claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Turner*, 482 U.S. at 90–91, 107 S.Ct. 2254 (emphasis added) (citations omitted).

 The burden is on the prisoner challenging the regulation, not on the prison officials, to show that there are obvious, easy alternatives to the regulation. *See O'Lone*, 482 U.S. at 350, 107 S.Ct. 2400 ("By placing the burden on prison officials to disprove the availability of alternatives,

the approach articulated by the Court of Appeals fails to reflect the respect and deference that the United States Constitution allows for the judgment of prison administrators."); *Turner*, 482 U.S. at 91, 107 S.Ct. 2254; *Casey*, 4 F.3d at 1523 ("It is incumbent upon the *prisoners* to point to an alternative that accommodates their rights at *de minimis* cost to security interests." (emphasis added)).

Mauro pointed to two alternatives in the district court: (1) a reading room for inmates to view sexually explicit materials; and (2) psychological testing of inmates who would be "fit" to receive sexually explicit materials.[6] We agree with the district court that both of these alternatives would impose more than a *de minimis* cost on valid penological interests and are therefore inadequate alternatives to the policy.

First, confining sexually explicit materials to a reading room would not prevent the sexual harassment of female detention officers. In fact, the female officers transporting inmates to and from the reading room, as well as those monitoring the reading room, would be especially vulnerable to sexual harassment by the inmates. As Deputy Chief Larry Wendt stated in his deposition, the creation of a reading room "does not guarantee that female detention officers would not be subjected to the same kind of harassment and verbal abuse that they endured before adoption of the Policy in 1993."

Moreover, the creation of such a reading room would impose a significant administrative burden on the jail: inmates from different custody levels would need to be escorted to and from the reading room; strip searches of the inmates leaving the reading room would have to be conducted; and the reading room would have to be

---

**6.** Mauro points to several more alternatives on appeal that were not raised in the district court. Resolution of whether these newly raised alternatives would be adequate to address the jail's concerns would involve facts not fully developed in the record. We must

therefore decline to address these new arguments on appeal. *See Woods v. Saturn Distrib. Corp.*, 78 F.3d 424, 430 (9th Cir.1996); *Bolker v. C.I.R.*, 760 F.2d 1039, 1042 (9th Cir.1985).

monitored. As Deputy Chief Wendt stated in his affidavit:

6. Specifically, the proposal [of a reading room] is incompatible with the current design structure of the MCSO jails. Simply transporting inmates (from all custody levels) to a central reading room would be a logistical nightmare. Additionally, the current rooms used for attorney and family visitation are already over capacity. To accept Plaintiff's proposal would require the County to spend funds to build an entirely new room or unit with budgetary funds it does not have in its possession and on vacant space that it does not own.

7. The proposal would also impose an administrative burden on detention officers who would be required to transport inmates to and from the room, as well as the inconvenience of the strip-searching of every inmate before they may enter the room. We (MCSO command staff) simply do not have the manpower to provide this extra service for inmates. Even assuming only one percent (1%) of the approximately 6,500 MCSO inmates would want to use the room on a weekly basis, MCSO would have to escort sixty-five (65) inmates every week to this central reading room. We do not have the time or the available staff to accommodate this service.

The second alternative Mauro proposes, the psychological testing of inmates, is also an inadequate alternative. Although psychological testing may prevent sexual offenders from receiving sexually explicit materials and therefore adversely affecting their rehabilitation, such testing would not address the other reasons for having the policy-prison security and sexual harassment of the female detention officers. *See Friend v. Kolodzieczak*, 923 F.2d 126, 128 (9th Cir.1991) (holding that inmates' proposed alternative was inadequate where it satisfied some, but not all, of prison officials' concerns).

Because Mauro failed "to point to an alternative that accommodates [his] rights at *de minimis* cost to security interests,"

we hold that the policy "is not an exaggerated response" to the problems sought to be addressed by the defendants. *See Casey*, 4 F.3d at 1523.

## IV.

■ We recognize that there may be a different, less restrictive means of achieving defendants' legitimate objectives. Under *Thornburgh*, however, the defendants are not required to adopt the least restrictive means of achieving these objectives. Rather, the defendants must simply ensure that the policy is reasonably related to legitimate penological interests. Because, under the facts of this case, the prohibition on sexually explicit materials fulfills this reasonableness test, we hold that the policy does not violate the First Amendment.

AFFIRMED.

SCHROEDER, Circuit Judge, with whom Judges B. FLETCHER and THOMAS, Circuit Judges, join, dissenting:

I respectfully dissent.

The majority upholds a regulation that is not the regulation being enforced by Maricopa County in its jails. The County's regulation defines "sexually explicit" materials as those materials that "show frontal nudity." It bans publications ranging from the *National Geographic* to art books displaying Michelangelo's *David.* At the same time, it permits inmates to receive the *Sports Illustrated* swimsuit issues and seductive lingerie catalogs. The Maricopa County regulation is not rationally related to any goal of rehabilitation, security, or preventing sexual harassment. It thus fails the primary test articulated by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 89–90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

The majority treats the regulation as if it were far narrower and limited to sexually explicit depictions like those contained in hard or soft core pornographic publications. As our panel originally and unani-

mously held, the regulation is overbroad and flunks the second *Turner* test as well. It leaves no alternative means for inmates to exercise their First Amendment rights to illustrated educational, religious, or other materials that may contain nude figures but are unrelated to any of the penological concerns underlying the regulation.

In upholding the regulation, the majority puts us in conflict with the Supreme Court's teaching in *Thornburgh v. Abbott*, 490 U.S. 401, 417 n. 15, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989), that prisons should eschew prohibition of broad categories of publications. The Court, in *Thornburgh*, approved a regulation that permitted a federal prison warden to exclude any specific publication after the warden determined that it was "detrimental to the security, good order, or discipline of the institution." *Id.* at 416, 109 S.Ct. 1874. Although the standard for exclusion may have seemed broad, the Court explained that it was circumscribed by the requirement that "no publication may be excluded unless the warden himself makes the determination." *Id.* The Court favorably referred to other provisions of the regulation that prohibited the warden from delegating his exclusion power or establishing a list of excluded publications. *Id.* at 416–17, 109 S.Ct. 1874.

In contrast, Maricopa County's policy places the power of exclusion far from the jail's administrators, leaving it up to several rotating, relatively low level mail officers to decide whether a publication is impermissible. Moreover, the policy seeks to facilitate the mail officers' detection of prohibited material by imposing an easy to administer, bright line, standard of "frontal nudity." Consequently, the County's policy falls squarely within the *Thornburgh* Court's admonition that "[a]ny attempt to achieve greater consistency by broader exclusions might itself run afoul of the second *Turner* factor." *Id.* at 417 n. 15, 109 S.Ct. 1874.

No other court has upheld such a broad intrusion into an inmate's First Amendment rights. *See, e.g., Thornburgh,* 490 U.S. at 405 n. 6, 109 S.Ct. 1874 (banning sexually explicit materials involving homosexuality, sado-masochism, bestiality, and children); *Giano v. Senkowski,* 54 F.3d 1050, 1052 (2d Cir.1995) (banning nude or semi-nude photographs of inmates' wives or girlfriends); *Dawson v. Scurr,* 986 F.2d 257, 259 n. 2 (8th Cir.1993) (regulation prohibiting "material portraying bestiality, sadomasochism, child nudity, or child sexual activity," and several other sexual acts).

Yet the majority appears to believe it has a regulation similar to that recently upheld by a panel majority of the D.C. Circuit in *Amatel v. Reno,* 156 F.3d 192 (D.C.Cir.1998), *cert. denied* —— U.S. ——, 119 S.Ct. 2392, —— L.Ed.2d —— (1999). The Maricopa County regulation is very different. In *Amatel,* the court upheld a federal regulation prohibiting material that is "sexually explicit" or "features nudity." The Bureau of Prisons adopted a definition of "features nudity" that is much narrower than Maricopa County's standard: " 'features' means that 'the publication contains depictions of nudity or sexually explicit conduct on a routine or regular basis or promotes itself based upon such depictions. in the case of individual onetime issues.' " *Amatel,* 156 F.3d at 194. More significant, however, is that the regulation in *Amatel* expressly provides for an exception to the ban on material that features nudity "if it contains 'nudity illustrative of medical, educational, or anthropological content.' " *Id.* Accordingly, the *Amatel* court acknowledged that the regulation prohibited only "pornography." *Id.* at 199 ("The legislative judgment is that pornography adversely affects rehabilitation."); *id.* ("We think that the government could rationally have seen a connection between pornography and rehabilitative values.").[1]

---

1. "Pornography" is defined as "material (as books or a photograph) that depicts erotic behavior and is intended to cause sexual ex-
citement." Webster's New Collegiate Dictionary 888 (1979).

Maricopa County's regulation proscribes much more. This record demonstrates that prison officials would ban a photograph of a nude Christ painted by Michelangelo. *See Mauro v. Arpaio,* 147 F.3d 1137, 1143 (9th Cir.1998). The D.C. Circuit in *Amatel* observed that "[w]e find it all but impossible to believe that the *Swimsuit Edition* and *Victoria's Secret* pass muster while Michelangelo's *David* or concentration camp pictures fail; nor has there been any suggestion that any prison official has attempted to implement such a bizarre interpretation." 156 F.3d at 202. The record in this case establishes the very facts that the *Amatel* court found "all but impossible to believe."

Moreover, the sole justification offered by the federal prisons in *Amatel* for their regulation was inmate rehabilitation. Here, however, the plaintiff is a pretrial detainee who has not yet been convicted of any crime. Just as the County has no legitimate interest in his punishment, *see Bell v. Wolfish,* 441 U.S. 520, 535–36, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), neither can it have a legitimate interest in his rehabilitation. *See McGinnis v. Royster,* 410 U.S. 263, 273, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973) ("[I]t would hardly be appropriate for the State to undertake in the pretrial detention period programs to rehabilitate a man still clothed with a presumption of innocence."); *United States v. Hearst,* 563 F.2d 1331, 1345 n. 11 (9th Cir.1977) (observing that a pretrial detainee can "assert his status as a shield" against jail policies aimed at rehabilitation). The majority appropriately recognizes that the County's goal of rehabilitation is not legitimate as applied to pretrial detainees, but dismisses any concern simply by noting that the County's jails house "a mix of pretrial detainees and convicted inmates."

The County did not rationalize its reliance on rehabilitation by arguing that some of its jail's residents are convicted inmates. Quite the contrary, the County has consistently argued to this court that the brief stay of its inmates, an average of 13.6 days, is a consideration that favors the regulation's validity. The thrust of the County's argument is that this regulation can rehabilitate inmates who on average spend just two weeks in its jails.

The County even stresses that its goal of rehabilitation is aimed at pretrial detainees. It explains that the regulation is intended "to prevent the introduction of sexually explicit materials into an environment where 10–20% of all inmates *are facing charges* involving sexual offenses." (emphasis added). It apparently matters not to the County that inmates "facing charges" are presumed innocent and cannot be the subject of rehabilitative efforts. The fact that the County argues to this court that its regulation advances an illegitimate interest in rehabilitation merely underscores the lack of rationality behind the regulation. Furthermore, because the County in this case cannot invoke rehabilitation as a justification for the policy, *Amatel* provides none of the support the majority would draw from it.

In fact, the regulation upheld in *Amatel,* while less intrusive than the regulation we have before us, is not itself free from constitutional doubt. That regulation prompted an eloquent dissent from Judge Wald:

> Claims of prisoners to read magazines like *Playboy* or *Penthouse* may not be the ideal vehicles for the articulation of First Amendment rights. But, as Dostoyevsky observed, "the degree of civilization in a society is revealed by entering its prisons." F. DOSTOYEVKSY, THE HOUSE OF THE DEAD 76 (C. Garnett trans., 1957). Today's ruling that prisoners may be stripped of rights to view publications of their choice on the mere assertion of legislators or regulators-far removed from the prison scene and without supporting evidence of any kind-that those publications will hinder their "rehabilitation" goes well beyond prior precedent and the case law in other circuits. It is a most troubling precedent.

*Amatel,* 156 F.3d at 214 (Wald, J., dissenting).

The majority assumes that prison inmates, including pretrial detainees like Mauro who have been convicted of no crime, are demeaned individuals who would prefer to see trash rather than art and whose First Amendment rights therefore will not be affected. This assumption is without precedent and diminishes our constitutional protections.

### B. FLETCHER, Circuit Judge, dissenting:

I concur fully in Judge Schroeder's dissenting opinion. The regulation at issue prohibits material ranging from art books displaying Michelangelo's *David* to issues of *Sports Illustrated* depicting male Olympic swimmers. As Judge Schroeder amply demonstrates, such a prohibition is of unprecedented breadth and cannot pass constitutional muster. The majority's attempt to avoid this infirmity by adopting an unduly narrow reading of the regulation is without support either in the text of the regulation or in the County's expressed understanding of the regulation.[1]

I also agree with Judge Kleinfeld that on the specifics of this case, summary judgment should not have been granted for the County. As Judge Kleinfeld rightly points out, the County may not attempt to "reform" or "punish" pretrial detainees. *See Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The majority responds that Mauro did not raise the issue of whether the regulation is imposed for the purpose of punishing pretrial detainees, and that he has therefore waived it. *See* Majority Opinion at 10 n.2. In so concluding, the majority ignores the essence of Mauro's suit. Throughout this case, Mauro has referred to himself as a pretrial detainee. In addition to challenging the regulation as facially overbroad, he challenges the application of the regulation to him. By claiming that the regulation

may not validly be applied to him, Mauro necessarily contends that the purpose of the regulation does not justify its application to him. That is, he claims that the purpose of the regulation does not justify its application *to a pretrial detainee.* Only by ignoring the obvious fact, reflected in the record, that Mauro is (or was at the relevant time) a pretrial detainee can the majority conclude that he has waived the claim most central to his suit.

Last, I agree with Judge Kleinfeld that conventional jail and prison disciplinary measures—unit segregation, full restriction, and reclassification—are more appropriate responses to the harassment of female guards by inmates. The county of course has a legitimate interest in preventing the harassment of its employees. But by choosing to ban such an astonishingly broad range of material, the county imposes a substantial and unjustifiable burden on the First Amendment rights of even those who have no history of harassment, and who have not yet been convicted of any criminal offense. Such an imposition is totally out of proportion to the problem at hand.

The majority apparently concludes that the First Amendment does not protect the right of, for example, a nonviolent, nonharassing pretrial detainee to pursue his general equivalency diploma by reading a Western Civilization textbook containing a chapter on the art of the Renaissance. Surely the Constitution's prohibition on laws "abridging the freedom of speech," U.S. Const. amend. I, means more than that. Because the majority concludes it does not, I respectfully dissent.

### KLEINFELD, Circuit Judge, with whom Judge B. FLETCHER, Circuit Judge, partially joins, dissenting:

Mauro is a pretrial detainee. As of the time covered by the record in this case, he

---

1. The Deputy Chief of the Maricopa County Custody Bureau confirmed the breadth of the regulation in his deposition:

> Q: So if somebody was just topless with their bottom covered and that was de-

> picted in a photograph or picture, that would be considered frontal nudity?
> A: Yes.
> Q: And it doesn't distinguish between male or female nudity, correct?
> A: Correct.

had not been convicted of the crime for which he was being held. He evidently waited two years in the county jail for his trial.[1] This case involves his rights prior to conviction. He has some experience in various jails, and has been accustomed to reading *Playboy, Penthouse, Time, Newsweek,* and newspapers while in jail. There is no evidence in the record that he has used any of these publications in any of the inappropriate ways described in the majority opinion, and he testified in his deposition that he has not. He says in his deposition that he likes to read *Playboy* for the articles. This case arises from his being turned down on a request that he receive his *Playboys.*

My guess is that at the end of the day, the majority will turn out to be correct, that the jail can ban publications showing frontal nudity, in order to maintain security and discipline. But we are not yet at the end of the day. A person's rights should not be taken away on the basis of a guess. There is a genuine issue of material fact. The case was dismissed on summary judgment, without a trial, so a genuine issue of material fact requires reversal. The issue of fact is whether the ban was imposed to preserve jail security and discipline, or for purposes of punishment. There is evidence in the record that the reason why the jail excludes publications with frontal nudity is to punish the prisoners. If so, the ban is unconstitutional. "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."[2] There was also evidence that the jail excluded publications showing frontal nudity to maintain order, and that it was not excessive in relation to that purpose. If so, the ban is probably permissible. A trial is the way to find out.

The majority overlooks the issue of fact because it uses the wrong case as a source of the controlling rule. The majority uses the rule from *Turner v. Safley,* "reasonably related to legitimate penological interests."[3] That rule applies to prisons, which impose punishment upon people who have been convicted of crimes. We should use the rule from *Bell v. Wolfish,* that a jail restriction is unconstitutional if it is imposed for purposes of punishment, but is constitutional if it is "but an incident of some other legitimate governmental purpose," such as to assure that the individual will be present for his trial, or "to maintain security and order at the institution." There is a genuine issue of fact under the rule in *Bell,* even though there is not under *Turner.* That is because "legitimate penological interests" include punishment. That purpose generally validates a rule for convicted prisoners, but invalidates it for pretrial detainees.

"Prisons" and "jails" are not the same things. Jails hold people pending trial, and for short punitive sentences after conviction.[4] Prisons hold people convicted and sentenced to substantial incarceration, ordinarily for felonies.[5] The case before us is a jail case, not a prison case. The plaintiff was being held to await his trial, in the Madison Street Jail, one of several in the Maricopa County jail system. I have not found anything in the briefs and excerpts of record to show that any of the

1. It may be that, were the record to disclose current circumstances, we would have to take notice that Mauro lacks standing, so there is no case or controversy. It seems doubtful that he is still a pretrial detainee in the Madison Street Jail. But the record has nothing in it to indicate the absence of standing.

2. *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

3. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

4. Black's Law Dictionary 834 (6th ed.1990) (jail is "[a] place of confinement that is more than a police station lockup and less than a prison. It is usually used to hold persons either convicted of misdemeanors (minor crimes) or persons awaiting trial or as a lockup for intoxicated and disorderly persons.").

5. Black's Law Dictionary 1194 (6th ed.1990) ("[t]he words 'prison' and 'penitentiary' are used synonymously to designate institutions for the imprisonment of persons convicted of the more serious crimes, as distinguished from reformatories and county or city jails.").

prisoners in the Madison Street Jail have been convicted of the crimes for which they are being held, although the county jail system as a whole of course houses both pretrial detainees and persons convicted of crimes. The county can punish convicted inmates, and can restrict First Amendment rights of pretrial detainees to maintain order in the jail, but it cannot punish pretrial detainees or take away First Amendment right of pretrial detainees to maintain uniformity with punishment rules for convicted criminals in other facilities.

Although the majority concedes in footnote 1 that a prison regulation cannot be adopted for the purpose of punishing and rehabilitating pretrial detainees, its application of the "legitimate penological interest" test allows exactly that. "Penological" means relating to the "theory and practice of prison management and criminal rehabilitation." [6] The word is derived from the Greek and Latin words meaning penalty or punishment, and still means roughly the same thing.[7] *Turner*, after formulating the test, expressly treats rehabilitation as a legitimate penological interest in its holding regarding a prohibition against inmate marriages.[8]

Our disagreement on which rule to apply has substantial practical significance for this case, because there is evidence that the reason why the jail prohibits Mauro

from receiving *Playboy* is to punish him. Under *Bell v. Wolfish*,[9] Mauro is entitled to defeat the restriction if he can show either of two propositions to be true, an express intent to punish, or a purpose of punishment that can be inferred from excessiveness of the restriction in relation to the legitimate purpose assigned to it:

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].[10]

Thus the question for us is whether the record establishes a genuine issue of fact on either of these two questions. If it does, Mauro is entitled to try to prove his case.[11]

Mauro had evidence sufficient to establish an issue of fact material to both *Bell* questions, though he only needed evidence on one. First, he produced evidence of what *Bell* phrases as "an expressed intent to punish on the part of detention facility officials." [12] Sheriff Arpaio, who runs the

---

**6.** *Am. Heritage Dictionary* 918 (2d college ed.1985).

**7.** *Id.*

**8.** *Turner v. Safley*, 482 U.S. 78, 97–99, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

**9.** *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

**10.** *Bell*, 441 U.S. at 538, 99 S.Ct. 1861 (internal citations and quotations omitted).

**11.** The majority opinion argues that whether the policy at issue was imposed for the purpose of punishing pretrial detainees "was not raised by the parties in their briefs" so has been waived. Mauro's brief broadly challenges the constitutionality of the policy on all

grounds. The parties dispute the legitimacy of the purpose of the policy. Mauro's brief discusses the Penthouse interview with Sheriff Arpaio "in which he stated that the purpose behind prohibiting sexually explicit magazines was to 'punish' jail inmates." The brief for the sheriff and the county argues that the ban had three purposes, "eliminating workplace discrimination" against female detention officers, "rehabilitation," and "to prevent fights among inmates." The brief argues that "rehabilitation of inmates is clearly a legitimate penological interest." The penological interest of rehabilitation is identical to that of punishment, in that it is constitutionally limited to people who have been convicted of crimes. I therefore do not agree that the punishment aspect of the case "was not raised by the parties in their briefs."

**12.** *Bell*, 441 U.S. at 538, 99 S.Ct. 1861.

jail, said, in one of the exhibits submitted in opposition to summary judgment, that his purpose in keeping sex magazines out of the jail was to punish the prisoners:

> I don't think you should live better in jail than on the outside.... They shouldn't be country clubs. No Club Fed in my jails. When you go to jail you should have to give up certain things—smoking, coffee, *adult magazines*, and R-rated movies. *Jail means punishment.* ... This is my jail and *they stay here until they're convicted and sent to state prison....* I've seen some of them interviewed on national television, saying they'll sign plea agreements just to get out of my jail and be sent to prison.[13]

It is hard to imagine better evidence that the purpose of a restriction is punishment than the man who runs the jail saying that his pretrial detainees "should have to give up ... adult magazines" because "jail means punishment." And the sheriff uses careful and precise phrasing to make it clear that he is talking about pretrial detainees, not convicted criminals.

Arguably this quotation is not cognizable evidence under Rule 56(c) and (e) because it may be inadmissible hearsay. I cannot tell from the excerpts of record we have whether that is so. Probably the statement is an admission so not hearsay as to the defendant's own words.[14] But the statement may be inadmissible hearsay by the reporter who purported to quote Sheriff Arpaio saying these words.[15] I do not know whether Sheriff Arpaio has admitted the accuracy of the quotation,[16] or whether a declaration by the reporter has been filed saying that the sheriff used these words. The district judge did not reach the question. Admissibility of this critical evidence ought to be ruled on in the district court.

Even without the sheriff's admission, Mauro has established a genuine issue of fact material to the second *Bell* criterion, "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]."[17] The Supreme Court did not say "excessive in relation to the burdens of being in jail generally"—for a jail inmate, being deprived of *Playboy* is among the less substantial interferences with his liberty. The excessiveness is to be measured in relation to the legitimate purpose of maintaining order in the jail. If the restriction is excessive in relation to that legitimate purpose, that is evidence that it serves a punitive purpose, which is not legitimate as to people not yet convicted of the crime for which they are jailed.

The papers submitted on the summary judgment motion would enable a jury to conclude that the prohibition of publications showing frontal nudity was excessive in relation to the purpose of maintaining order, and was adopted for other purposes, including punishment and public relations. The memorandum written by the deputy chief of the custody bureau to the sheriff to justify the policy lists several purposes other than and in addition to maintaining order. Among them are that "morally we should not provide this material to those people" (referring to people charged with sex crimes), and "[f]ederal law requires that if a female employee makes a complaint regarding what she considers obscene, that we as employers must ensure this material is removed." The memorandum also discusses the public relations aspect of presenting the ban to reporters, noting that "[t]he newspaper may bring up the fact that the Arizona State Prison sys-

---

13. Exhibit E to plaintiff's motion for preliminary injunction, Allan Sonnenschein, *Sheriff Joe Arapaio, Penthouse*, January, 1995, at 87, 134 (emphasis added).

14. Fed.R.Evid. 801(d)(2).

15. *Larez v. City of Los Angeles,* 946 F.2d 630 (9th Cir.1991).

16. *Cf. Masson v. New Yorker Magazine, Inc.,* 85 F.3d 1394 (9th Cir.1996).

17. *Bell,* 441 U.S. at 538, 99 S.Ct. 1861.

tem allows both smoking and sexually explicit material to its prisoners." The moral rehabilitation of the prisoners must, of course, await their convictions.

As the majority opinion sets out, some prisoners did disgusting things using sexually oriented magazines as props, to harass female guards. So far as the record indicates, the plaintiff never did. The harassment by other prisoners does not establish that banning the magazines is not excessive relative to the goal of maintaining order. Every single one of the harassing actions by inmates was plainly prohibited by the jail discipline code. The jail has express rules against "engaging in sexual acts," "making sexual proposals or threats," "indecent exposure," "refusing to obey direct orders from M.C.S.O. staff," "assault on employee," "fighting," and "conduct which disrupts security or operation of institution," among others. The penalties are substantial—typically disciplinary segregation, full restriction, and reclassification. Indecent exposure, engaging in sexual acts, making sexual proposals, are all subject to restriction, unit segregation and other sanctions. These sanctions can be imposed by means of a simple internal discipline procedure, without the burden of proving criminal charges.

Yet the jail banned the magazines and other materials for everyone, instead of punishing the people who used them as props with which the harass the guards. Though the inmates could not be punished for the crimes with which they were charged until they were convicted in court, they could be punished for discipline violations after relatively informal discipline proceedings in the jail. Punishment of malefactors is the traditional means of preventing people from misusing their liberties while leaving the liberties intact for those who do not misuse them. One inmate whose conduct was especially egregious was charged with a crime, but so far as the record indicates, the jail discipline system was never used to deal with the violative uses of sexual magazines by prisoners.

The reason jail personnel gave for not using the discipline system was that there were too many violations and the jail stays were too short. That reason is necessarily speculative where discipline proceedings charges were not even attempted. Even though all the drivers on an expressway may be going twenty miles an hour over the speed limit, it will probably not be necessary to ticket more than a few to get the rest to slow down. Likewise for more serious offenses such as the prisoners' disorderly use of sexual magazines, punishment of a few may deter the rest. The liberty at issue, a First Amendment liberty to read (and of publishers to have access to readers [18]) is a substantial one, especially where it involves people whom the state holds as prisoner but who have not yet been convicted of crimes. Ironically, the prisoners could not read the *Penthouse* interview of the sheriff because it appeared in a publication that shows frontal nudity. It may be that trial would lead to a finding of fact that, without evidence that the discipline system had been tried and failed, a total ban was excessive relative to its legitimate purpose. (Or it might be that it would not—the case could go either way on the evidence in the record so far). There is enough here to allow the plaintiff to get the question to trial.

A related question on which there is a genuine issue of fact is whether the ban works. If the ban on sexual magazines is not a reasonably effective means for preventing inmates from fighting, harassing guards, and otherwise disrupting the good order of the jail, then the ban is excessive relative to that purpose. A ban on an exercise of a constitutionally protected liberty, to serve a permissible purpose, is excessive relative to that purpose if it does not effectively serve it. The depositions indicate that inmate sexual harassment of

---

**18.** *Thornburgh v. Abbott,* 490 U.S. 401, 408, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)

("publishers ... have a legitimate First Amendment interest in access to prisoners").

female guards has continued, despite the ban on sexual magazines, though some guards say it has declined. The evidence that inmates use sexual magazines as props to harass female guards, described in the majority opinion, does not show that banning sexual magazines prevents inmates from sexually harassing female guards. Many of the people who get thrown in jail are likely to act inappropriately with or without sexually oriented magazines. And considering that most people in jail are young males, they are likely to have sexual thoughts about their guards, if the jail uses female guards. Because the jail uses female guards for male prisoners, and because inmates in jail must give up their privacy in order to facilitate security, the female guards are going to see the prisoners doing things that are ordinarily not done in front of people of the opposite sex, or in front of anyone at all. A trial could go either way on whether the ban on publications, pictures from wives and girlfriends, and other material showing frontal nudity, serves the purpose of maintaining order in the jail or is excessive relative to that purpose because of ineffectiveness.

We have not reached the question whether publications showing frontal nudity may be kept from pretrial detainees in jail because of jail administrator's concerns that "[f]ederal law requires that if a female employee makes a complaint regarding what she considers obscene, that we as employers must ensure this material is removed." Defendants argue in their brief that preventing "hostile environment" in a workplace is a "compelling" government interest that justifies a ban on possession of sexually oriented speech. This rationale, of course, is not limited to jails.[19] The argument would justify a government ban on possession of publications showing frontal nudity in any workplace, whether they are displayed to anyone or not. I am not so sure that the Supreme Court deci-

sions allowing limitations on the rights of pretrial detainees to preserve order in the jail include this radical extension of sexual harassment law. The guards' workplace is the inmates' residence, and it is an unanswered question that would benefit from development of a record whether unconvicted individuals in pretrial custody must give up their liberty to read what they like in order to accommodate the guards' interest in the absence of sexually offensive material at their workplace. It is one thing for the jail to ban offensive sexual displays that may drive some women from the workplace, and another to ban receipt and possession even without display. The ban here is on receipt of publications, pictures of wives and girlfriends, and other materials that include frontal nudity, not on display of those items to guards or other improper use of them. The harassing displays and improper uses are prohibited by the discipline rules. That possession of these publications may offend does not justify banning them. "The States, acting as guardians of public morality" may not prohibit speech merely on the basis that it is offensive.[20] The harassment, as opposed to the offense, is caused by display of the magazines in a purposely harassing manner, but the regulation at issue goes to their receipt and possession even by those who do not engage in such conduct, such as the plaintiff.

As I said earlier, my speculation, as yet unsupported by facts because there has been no trial, is that the majority will turn out to be right in its result. Jails can be rough places, and need some blunt tools to make the prisoners behave themselves while they are there. The jail may well be able to show that nearly all the items showing frontal nudity that come in are sex magazines and photographs of wives and girlfriends, and that the inmates fight and otherwise disrupt the good order of the jail if these are allowed in, no matter

---

**19.** *See generally,* Eugene Volokh, *Freedom of Speech and Appellate Review in Workplace Harassment Cases,* 90 Northwestern Univ. L.Rev. 1009 (1996).

**20.** *Cohen v. California,* 403 U.S. 15, 22–23, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971).

what the jail tries to do about discipline. . On the other hand, the majority may be wrong. The evidence might establish that the purpose of the ban on frontal nudity pictures is to punish the prisoners and rehabilitate them, as is proved by express declarations or excessiveness relative to the goal of preserving order in the jail. A trial is a good way to find out. Arizona has to convict these people before it is entitled to punish and rehabilitate them. We must not follow the Red Queen's injunction, "sentence first—verdict afterward." [21]

---

**21.** Lewis Carroll, *Alice's Adventures·in Wonderland* 146 (Random House 1946).