**Louie E. AIELLO, Brian Huisman, Demian McDermott, Corey Keller, Dean Sabin, Cody Vandenberg and Casey Fisher, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**Jon E. LITSCHER, Secretary, Richard Verhagan, Administrator, Wisconsin Department of Corrections Division of Adult Institutions, Defendants.**

No. 98–C–0791–C.

United States District Court, W.D. Wisconsin.

June 7, 2000.

Lauren B. Raphael, Roger Baldwin Foundation of ACLU, IN, Chicago, IL, for plaintiffs.

John J. Glinski, Assistant Attorney General, Madison, WI, for defendants.

### OPINION AND ORDER

CRABB, District Judge.

In this civil action for injunctive relief, plaintiff prisoners Louie E. Aiello, Brian Huisman, Demian McDermott, Corey Keller, Dean Sabin, Cody Vandenberg and Casey Fisher, on behalf of themselves and as representatives of a class of similarly-situated Wisconsin prisoners, contend that a policy enacted by defendants Jon E. Litscher and Richard Verhagan of the Wisconsin Department of Corrections pro-

hibiting access to allegedly sexually explicit materials violates their rights to freedom of speech protected by the First Amendment and due process of law protected by the Fourteenth Amendment. Subject matter jurisdiction is present. *See* 28 U.S.C. § 1331. The case is before the court on defendants' motion for summary judgment and plaintiffs' motion to correct two citation errors. Because I find that there are material disputes of fact regarding whether the challenged regulation serves legitimate penological interests and provides fair notice of what it prohibits, defendants' motion for summary judgment will be denied. Plaintiffs' motion to correct two citation errors will be granted.

## I. *MOTION FOR SUMMARY JUDGMENT*

A word is required regarding defendants' proposed findings of fact. Defendants cite the affidavit testimony of their witnesses for record support of their proposed facts, but the credibility of that testimony is in grave doubt. An example from the affidavit of Sergeant Marcia L. Byers illustrates the problem. Byers was a guard at least two prisons in Wisconsin. In her sworn affidavit, Byers stated,

> Prisoners often deal in materials prohibited by the rule because it has value inside the prison. Prisoners will sell or rent such materials to other prisoners for profit or to pay off debts. Such materials can include publications such as *Playboy* magazine, *Penthouse* magazine, *Hustler* magazine, *Gallery* magazine, the *Sports Illustrated* swimsuit issue, *Victoria's Secret* catalogs, *Vanity Fair* magazine, *Cosmopolitan* magazine, *Maxim* magazine, *National Geographic* magazine and medical, scientific and artistic publications.

The same paragraph, with minor variations, appears in many if not most of the sworn affidavits defendants submitted. However, when deposed, Byers testified she had never even heard of *Maxim* or *Vanity Fair* magazines before her deposi-

tion, had never seen a *Sports Illustrated* swimsuit issue and had never seen inmates selling or renting *Penthouse*, *Cosmopolitan* or the *Victoria's Secret* catalog. In fact, Byers could recall only one incident in which there was a problem related to a magazine, *Hustler*, and that occurred only at the women's prison where she was formerly a guard. This is significant because Byers also stated in her affidavit (in another paragraph that reappears repeatedly in other affiants' testimony) that one problem with the presence of such magazines and "medical, scientific and artistic publications" is that male prisoners use them to masturbate in front of female guards or otherwise expose themselves to the female guards.

In short, Byers's sworn affidavit was untrue and possibly perjurious. And hers is only one example; several of defendants' deposed affiants contradicted their own sworn affidavits or revealed that their "personal knowledge" was based on many, many layers of hearsay. For example, defendants' expert Dr. Hands admitted in deposition testimony that he did not know whether any incidents of inappropriate touching of staff by inmates had anything to do with materials banned by the regulation, despite his affidavit averment that they did. Defendants' rather cavalier response is that even if some of the sworn testimony they submitted is untrue, plaintiffs have not proven that all of it is. It is true that plaintiffs' pro bono counsel did not depose every one of defendants' affiants and not all of those who were deposed contradicted their affidavit testimony, but those who did cast a pall on the credibility of the rest. *See Colosi v. Electri–Flex Co.,* 965 F.2d 500, 503 (7th Cir.1992) ("If a party presents multiple affidavits on summary judgment, covering the same ground, and some are shown to be unworthy of belief and others are not, do those others entitle the party to summary judgment or can the falsity of some support a negative inference about the others? We should think the latter, at least in extreme cases."). It is not the court's responsibility to compare each affidavit with the depo-

sition testimony of the affiant; it is defendants' responsibility to insure that each affidavit they submit to the court is based upon the affiant's personal knowledge. *See* Fed.R.Civ.P. 11. This is particularly so because the same boilerplate language, obviously drafted by defendants' counsel, appears again and again as the affiants' own sworn testimony, and it is this language in particular that several affiants admitted was not derived from their personal knowledge. Not only is this practice potentially sanctionable, *see* Rule II(b)(3), it is an unwise litigation strategy. The credibility of all of defendants' affidavit testimony has been compromised by their carelessness (at best) in submitting some that is untrue.

In addition, both parties ignored the requirement of this court's *Procedure to be Followed on a Motion for Summary Judgment* at I.C.2. that "to the extent practicable, each paragraph shall state only one factual proposition." Instead, the parties often included dozens of factual proposition within a single paragraph, followed by string citations to deposition or affidavit testimony that does not explain which part of the record supports which proposition. With the credibility of defendants' proposed facts already in doubt, and with the parties' failure to identify specific facts and support them with citations to the record, the court is left with an almost insurmountable burden in attempting to cull a body of undisputed facts in order to decide defendants' motion for summary judgment.

Because it is defendants' motion for summary judgment, there is a heightened burden on defendants to assist the court in creating a body of undisputed facts. In submitting affidavit evidence not based on the personal knowledge of the affiants, defendants do not carry out that responsibility. The court simply does not have the resources to sort through each affidavit and deposition to discover which are trustworthy and therefore which facts are truly undisputed for the purpose of deciding defendants' motion. The "sanction" defen-

dants will suffer for submitting false affidavits is not a punishment but rather is the inevitable consequence of submitting such affidavits: most of their proposed facts cannot be credited and thus cannot form a basis for deciding their motion in their favor.

Even with the credibility of defendants' proposed facts compromised, most of the proposed facts in this case are in dispute. However, from facts proposed by the parties, I find the following to be material and undisputed.

### UNDISPUTED FACTS

In 1994, the Wisconsin Department of Corrections appointed a committee of experienced staff to reevaluate department's regulations governing materials coming into the prisons. The previous regulations had prohibited materials that met the legal standard for obscenity as well as visual depictions of acts such as sadism, bestiality and sex involving children. The committee recommended new language clarifying restrictions on personal photographs, sexual contact involving violence and other material raising specific concerns regarding security and rehabilitation. The committee recommended that magazines depicting nudity but not deviant sex acts, such as *Playboy*, should not be banned from the prisons. The committee never considered banning verbal descriptions of sexual activity in personal letters or books.

The governor's office intervened in the process, ordering that the regulation be written more broadly. Mr. Simonson, a lawyer who served as the governor's representative, insisted that the regulation be written more broadly despite advice from committee members that they "felt strongly" that materials such as *Playboy* should be allowed. The breadth of the resulting regulation was questioned and ridiculed by some of the department's employees.

As enacted, Wis.Admin.Code DOC § 309.04(4)(c) prohibits prison officials from distributing certain incoming correspondence to inmates for a variety of enumerated reasons. One such restriction applies to mail that is "injurious," defined as any material that is "in whole or in part, pornography." § 309.04(4)(c)8.a. Similarly, under § 309.05(2)(b), inmates may not receive publications that are injurious, as defined in § 309.04. Pornography is defined as including

> ... any material, whether written, visual, video, or audio representation or reproduction that depicts any of the following:
>
> (a) Human sexual behavior.
>
> (b) Sadomasochistic abuse....
>
> (c) Unnatural preoccupation with human excretion.
>
> (d) Nudity which appeals to the prurient interest in sex.
>
> (e) Nudity which is not part of any published or printed material, such as a personal nude photograph.

§ 309.02(16). Nudity "means the showing of the human male or female genitals, pubic area or buttocks with less than fully opaque covering, or the showing of the female breast with less than fully opaque covering of any portion below the top of the areola or nipple, or the depiction of covered male genitals in a discernibly turgid state." § 309.02(14). Human sexual behavior is defined to encompass "the actual or simulated act" of any of the following:

> (a) Sexual intercourse ...
>
> (b) Fellatio or cunnilingus
>
> (c) Sodomy
>
> (d) Bestiality
>
> (e) Masturbation
>
> (f) Necrophilia
>
> (g) Sexual sadism or sexual masochistic abuse ...
>
> (h) Sexual excitement

§ 309.02(9). Sexual excitement "means the condition of human male or female genitals when in a state of sexual arousal." § 309.02(23).

Materials that have been banned under the regulation's prohibition on written de-

pictions of "human sexual behavior" include: (1) a letter from an inmate to his fiancé that included a single reference to sex; (2) an entire book, because on page 127 it included a reference to "handl[ing] ... a shaft of smooth ivory ... during the act of copulation"; (3) a magazine that contained an article about the ugliness of a prostitute's life; (4) an issue of *Cosmopolitan* magazine, because it contained an article about sex; (5) an issue of *Maxim* magazine, because it contained an article about oral sex; and (6) a letter in which a woman complained in detail to an inmate about the circumstances under which they had had sex, including the fact that it was unprotected.

Materials that have been banned under the regulation's prohibition on depictions of "nudity which appeals to the prurient interest in sex" include: (1) a picture of Michelangelo's Sistine Chapel; (2) art work by Herrera; (3) the *Sports Illustrated* swimsuit issue; and (4) issues of *Vanity Fair, Rolling Stone, Maxim* and various fitness and motorcycle magazines because they contain advertisements or photographs that show a portion of a buttock or breast.

Inmates who are found in possession of materials that violate the regulation are subject to discipline, even if they write or draw the materials themselves. In applying the regulation, low-level personnel must decide whether a particular communication or publication depicts enough sexual activity or reveals body parts sufficiently so that it must be banned. Decisions to ban such material are reviewed by supervisors.

Plaintiffs brought three separate complaints about the regulation under the inmate complaint review system. Ultimately, their complaints were dismissed by the Secretary of the Department of Corrections on the ground that the regulation was "related to legitimate correctional goals and it is noted that similar regulations have thus far withstood muster in the federal courts."

## OPINION

### A. *Exhaustion*

■ Defendants argue that plaintiffs have not exhausted available administrative remedies in regard to their claims as required under 42 U.S.C. § 1997e(a). I have already held that such remedies have been exhausted. *See Aiello v. Department of Corrections,* No. 98–C–791–C (W.D.Wis. Feb. 19, 1999). Defendants argue, however, that in addition to completing the inmate complaint review system set out in Wis.Admin.Code § DOC 310, plaintiffs must seek a declaratory ruling pursuant to Wis.Stat. § 227.41. Section 227.41 gives Wisconsin administrative agencies the discretionary authority to make declaratory rulings on issues raised by affected parties. *See Assn. of Career Employees v. Klauser,* 195 Wis.2d 602, 616, 536 N.W.2d 478, 485–86 (Ct.App.1995). Defendants argue that through such a proceeding, the Department of Corrections could have adopted an emergency regulation repealing all or part of the challenged regulations if it found them unconstitutional, notwithstanding the fact that the Secretary of the Department had already dismissed plaintiff's complaints under the inmate complaint review system because he believed the regulations passed constitutional muster.

■ For several reasons, I disagree with defendants' contention that plaintiffs were required to utilize the procedures under § 227.41. First, § 227.41 "does not provide a method of review of a determination already made" by the agency. *Wisconsin Fertilizer Assn. v. Karns,* 39 Wis.2d 95, 107, 158 N.W.2d 294, 300 (1968). Rather, § 227.41 provides only "a method of requesting an agency to make a determination." *Id.* Therefore, it appears that plaintiffs could not have used § 227.41 to challenge the Department of Corrections' dismissal of their complaint under the inmate complaint review system. Any other construction of § 227.41 would mean that the Department of Corrections would sit in

judgment on a decision made by itself. Defendants cite no Wisconsin cases that support such a construction. It is reasonable to assume that the Wisconsin legislature did not intend to produce that absurd result. *See United States v. Balint,* 201 F.3d 928, 932 (7th Cir.2000) (statutes should not be interpreted literally if literal interpretation would produce absurd results).

Second, defendants interpret the exhaustion requirement under 42 U.S.C. § 1997e(a) too broadly. Although there is no futility exception to the exhaustion requirement of § 1997e(a), *see Perez v. Wisconsin Dept. of Corrections,* 182 F.3d 532 (7th Cir.1999) (emphasis added), the statute does not require that prisoners do more than exhaust the prison's internal administrative grievance system. *See Massey v. Helman,* 196 F.3d 727, 733–34 (7th Cir.1999) ("[I]f a prison has an internal administrative grievance system through which a prisoner can seek to correct a problem, the prisoner must utilize that administrative system before filing a claim.... [C]ourts merely need to ask whether the institution has an internal administrative grievance procedure.... [I]f such an administrative process is in place, then § 1997e(a) requires inmates to exhaust those procedures before bringing a prison conditions claim."); *see also Alexander v. Hawk,* 159 F.3d 1321, 1326 (11th Cir.1998) (term "available" in § 1997e(a) refers to prison administrative remedy programs). Consistently with this interpretation, Wis.Admin.Code § 310.04 authorizes inmate suits following exhaustion of the department internal complaint review system.

Finally, it is interesting to note that although the federal government has an administrative procedure apparatus under 5 U.S.C. § 554 that parallels the procedure under Wis.Stat. § 227.41, defendants cite no cases in support of the proposition that any federal courts have required federal prisoners to utilize that procedure in addition to the Bureau of Prisons' internal administrative remedy program detailed at 28 C.F.R. § 542.10. Indeed, the very cases defendants cite in support of their contention that plaintiff must utilize the administrative procedure under Wis.Stat. § 227.41, *Massey* and *Alexander,* concerned federal prisoners who had not utilized the Bureau of Prisons' internal administrative remedy program. The Courts of Appeals for the Seventh and Eleventh Circuits both held that failure to utilize the internal procedure meant failure to exhaust available remedies under 42 U.S.C. § 1997e(a), but neither held that failure to utilize the external administrative procedure under 5 U.S.C. § 554 meant a failure to exhaust under 42 U.S.C. § 1997e(a). *See Massey,* 196 F.3d at 734; *Alexander,* 159 F.3d at 1326–27. I conclude that plaintiffs' failure to use the external administrative procedure under § 227.41 in addition to the internal procedure under Wis.Admin.Code § DOC 310 does not constitute a failure to exhaust available administrative remedies under § 1997e(a).

■ Defendants' alternative argument that plaintiffs have failed to exhaust the remedies available to them under Wis.Admin.Code § DOC 310 is similarly meritless. Defendants argue that because plaintiffs' complaints were filed before the challenged regulation was implemented, plaintiffs have not brought a complaint to challenge each alleged unconstitutional application of the regulation and thus cannot be heard to complain about such applications. This contention is misguided. Plaintiffs' challenge is not to a particular application of the regulation but to the regulation itself, which they contend is drafted in such a manner that unconstitutional applications must result. Each alleged unconstitutional application is not treated as a separate grievance but rather as evidence that the regulation is not reasonably related to legitimate penological interests, either as interpreted or applied by defendants. As defendants themselves argue, evaluation of the constitutionality of a challenged regulation must take into account the construction and consequent application of the enforcing body. *See, e.g.,*

*Amatel v. Reno,* 156 F.3d 192 (D.C.Cir. 1998).

## B. *First Amendment*

### 1. *The Turner test*

Several United States Courts of Appeals have held that prisoners' access to sexually explicit material may be restricted without violating the First Amendment because such restrictions are rationally related to the legitimate penological interests of security, rehabilitation and the prevention of harassment of female guards. *See Frost v. Symington,* 197 F.3d 348 (9th Cir.1999); *Mauro v. Arpaio,* 188 F.3d 1054 (9th Cir. 1999) (en banc); *Waterman v. Farmer,* 183 F.3d 208 (3d Cir.1999); *Amatel,* 156 F.3d 192; *Owen v. Wille,* 117 F.3d 1235 (11th Cir.1997). In each case, the court of appeals applied a version of the test articulated by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), to determine the validity of prison regulations that allegedly impinge upon the exercise of constitutionally protected rights.

■ Under *Turner,* a prison regulation does not infringe impermissibly upon rights protected by the First Amendment so long as the regulation is "reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. 2254; *Thornburgh v. Abbott,* 490 U.S. 401, 409, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). To decide whether a challenged regulation is reasonably related to legitimate penological interests, courts apply a four-part test. (Several courts have acknowledged that the four parts are unequal and tend to blend into one another. *See, e.g., Waterman,* 183 F.3d at 213–14; *Amatel,* 156 F.3d at 196). First, the court examines the scope of the challenged regulation or statute, its purported content-neutral objective and the fit between the two, that is, whether there is any "valid, rational connection between the policy and the legitimate governmental interest put forward to justify it." *Mauro,* 188 F.3d at 1059. An objective is "content-neutral" so long as its ultimate purpose is not the suppression of speech. *See*

*id.* (quoting *Thornburgh,* 490 U.S. at 415, 109 S.Ct. 1874). In other words, if the government objective is rehabilitation and maintenance of order, then the objective is 'content-neutral' for purposes of First Amendment analysis even if incidentally it restricts access to a particular type of speech because of its content. *See Amatel,* 156 F.3d at 196–197. If there is any rational connection between the challenged regulation and the administrator's content-neutral objective, the court then determines whether there are alternative means of exercising the right, whether accommodating the asserted right will have a significant negative impact upon others within the prison and whether the regulation is an "exaggerated response" to the state's legitimate concerns (that is, whether there are easy, obvious alternatives to the regulation that would be less restrictive but still accomplish its goals). *Id.*

■ This a very deferential standard; courts do not second-guess prison administrators lightly in their perception of the need for 'content-neutral' regulations. *See Mauro* at 1059. In particular, in determining whether there is a rational connection between the challenged regulation and its legitimate objectives, the court does not inquire whether there is such a connection in fact, but whether the regulation's enacters could have rationally concluded there is one. Scientific or expert evidence need not be unanimous in support of the connection, *see Amatel,* 156 F.3d at 201 ("For judges seeking only a reasonable connection between legislative goals and actions, scientific indeterminacy is determinative"), and in the absence of such evidence, common sense may provide the connection. *See id.* at 199 (common sense can be sufficient evidence of rational link between legitimate objectives and regulation); *but see* Marc Galanter, *Real World Torts: An Antidote to Anecdote,* 55 Md.L.Rev. 1093 (1996) (beliefs based upon common sense often factually wrong); Clifford Geertz, *Common Sense as a Cultural System, in Local Knowledge: Further Essays in In-*

*terpretive Anthropology* 75 (1983) ("Religion rests its case on revelation, science on method, ideology on moral passion; but common sense rests its case on the assertion that it is not a case at all, just life in a nutshell. The world is its authority.").

The two leading cases applying the *Turner* test in the context of the prohibition of sexually explicit materials are *Mauro* and *Amatel.*

### 2. *Mauro*

In *Mauro,* 188 F.3d 1054, the Court of Appeals for the Ninth Circuit, sitting en banc, held a jail was acting in a manner related reasonably to legitimate penological interests when it banned "sexually explicit materials," defined as "materials that show frontal nudity" including "personal photographs, drawings, and magazines and pictorials that show frontal nudity." *Id.* at 1057. The court found that before adoption of the policy, female guards found themselves compared by inmates to photographs of nude women and encountered inmates masturbating while looking at such pictures. *See id.* After adoption of the policy, these occurrences declined sharply. *See id.*

Applying the *Turner* factors, the court of appeals first determined whether there was any rational connection between the challenged policy and a legitimate governmental interest. To make this determination, the court determined whether the "objective underlying the policy is (1) legitimate, (2) neutral, and (3) whether the policy is 'rationally related to that objective.'" *Id.* at 1059 (citing *Thornburgh v. Abbott,* 490 U.S. 401, 414, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)). The court found that security, rehabilitation and reducing harassment of female guards were legitimate penological interests and that the regulation prohibiting "frontal nudity" was neutral in the technical sense of *Turner,* that is, the distinction between allowed and prohibited materials was drawn solely on the basis of their supposed effect on the prison's legitimate interests rather than on their ideological content.

Turning to whether the policy prohibiting the possession of materials showing frontal nudity was rationally related to an increase in security and rehabilitation and a decrease in harassment of female officers, the court found that rational relationship was "clear." *Id.* at 1061. The court found that in the past inmates had used nude photographs to draw anatomical comparisons between the wives, girlfriends and mothers of other inmates, that this had caused fights that jeopardized security, and that inmates had used such photographs to harass and masturbate in front of female officers. (The court did not explain how the prohibition increased rehabilitation.) The court acknowledged that the fit between the policy and the objectives was not exact but held that an exact fit was not required; all that was required was a "rational" connection.

The court of appeals then examined whether there were alternative means available for exercising the allegedly infringed right. Mindful that "the right in question must be viewed sensibly and expansively," *Mauro,* 188 F.3d at 1061 (quoting *Thornburgh,* 490 U.S. at 417, 109 S.Ct. 1874), the court found that the constitutional right infringed by the policy was "the right to receive sexually explicit communications." The court found that there were alternative means available for exercising this right because the policy forbade only sexually explicit materials visually depicting frontal nudity; materials not prohibited by the policy included (1) "sexually explicit letters between inmates and others"; (2) "sexually explicit articles"; and (3) "photographs of clothed females." *Id.* (quoting *Amatel,* 156 F.3d at 202 ("[T]he regulation by its terms only restricts pictures; a prisoner may read anything he pleases.")).

The court then found that the impact on others of allowing unrestricted access to sexually explicit materials would be significant because of the fights among inmates and harassment of female officers.

Finally, the court found that the policy was not an "exaggerated response" to the jail's concerns because there was no "ready alternative" to the policy that would still accomplish its legitimate objectives. *Mauro,* 188 F.3d at 1061. The court noted that the burden was on the prisoner challenging the regulation rather than on prison officials to show that there were ready alternatives to the regulation. *See id.* at 1062 (citing *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 350, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Turner,* 482 U.S. at 91, 107 S.Ct. 2254). The alternatives the plaintiffs suggested including a reading room for inmates to view sexually explicit materials and psychological testing of inmates who would be fit to receive sexually explicit materials. The court found that the reading room would not protect female officers from harassment and that psychological testing would not address the jail's concern with security and harassment. Accordingly, the court of appeals concluded the regulation was rationally related to legitimate penological objectives and thus did not violate the First Amendment.

### 3. Amatel

The law at issue in *Amatel,* 156 F.3d 192, is known as the Ensign Amendment. It prohibits the distribution of commercial material in federal prisons that "is sexually explicit or features nudity." The court did not analyze the amendment itself but regulations enacted pursuant to it by the Bureau of Prisons because these regulations narrowed the law's scope considerably. *See Amatel,* 156 F.3d at 196. The regulations define "nudity" as "a pictorial depiction where genitalia or female breasts are exposed." *Id.* at 193. Pictorial depictions "feature" nudity only if "the publication contains depictions of nudity or sexually explicit conduct on a routine or regular basis or promotes itself based upon such depictions in the case of individual onetime issues." *Id.* However, not all material that features nudity within the meaning of the regulation is prohibited; "nudity illustrative of medical, educational and anthropological content" is excepted

from the ban. *Id.* "Sexually explicit" is defined as "a pictorial depiction of actual or simulated sexual acts including sexual intercourse, oral sex, or masturbation." *Id.* As the court of appeals noted, "Under these regulations, then, there is no restriction whatever on non-pictorial sexually explicit material." *Id.*

In upholding the regulations in *Amatel,* the court of appeals applied the four-part *Turner* test and concluded that the regulations were supported by a legitimate governmental objective, namely, rehabilitation. *See Amatel,* 156 F.3d at 197. The court then found that because the regulations distinguish between publications for the purpose of inmate rehabilitation, not to root out content or viewpoints the government finds objectionable, they satisfied the *Turner* neutrality requirement. *See id.* Finally, the court recognized that although researchers were divided whether enforcement of the regulations would serve the underlying governmental objective, Congress could have concluded rationally that a connection exists between prohibiting the distribution of "smut" and promoting rehabilitation. *See id.* at 199–200. Characterizing this aspect of the *Turner* test as essentially a rational basis standard, the court asked simply whether a lawmaker could have formed a rational belief that such a connection exists in reliance on scholarship purporting to show such a causal connection. *See id.* at 199. The court found that Congress could have believed rationally that such a connection exists. *See id.* (citing, *e.g.,* Catherine A. MacKinnon, *Only Words* (1993)).

The court declined to analyze the Ensign Amendment regulations under the overbreadth doctrine, explaining that the policies animating this doctrine are captured sufficiently by the first and fourth factors in the *Turner* test. The court offered several reasons why the Ensign Amendment would not be applied in an overbroad manner. First, direct application of the law's sweeping prohibitions was remote because of the limiting construction

placed upon the amendment by the Bureau of Prisons regulations. *See Amatel,* 156 F.3d at 195 and 202. For example, under the regulations, a publication "features" nudity only if it does so "on a routine or regular basis or promotes itself based upon such depictions in the case of individual one-time issues," and does not apply to publications that contain "nudity illustrative of medical, educational or anthropological content." *Id.* at 194. The regulations included examples of permissible publications, including *National Geographic, Our Bodies, Our Selves,* the *Sports Illustrated* swimsuit edition and the *Victoria's Secret* lingerie catalog. *See id.* Taking into consideration all of these limitations, the court found it unlikely that prison officials would use the law to prohibit receipt of publications on the basis of content of unquestionable artistic or social importance, such as the work of Michelangelo. *See Amatel,* 156 F.3d at 202. The court placed equal emphasis on the fact that "the regulation by its terms only restricts pictures; a prisoner may *read* anything he pleases." *Id.*

With respect to the second factor, whether inmates have alternative means of exercising their First Amendment right, the court observed that the "right" in question must not be read too narrowly, but did not clearly define it other than to question whether prisoners enjoyed "some minimum entitlement to smut." *Amatel,* 156 F.3d at 201. However, the court did note that the challenged regulations provided adequate alternative means to exercise such an entitlement because it left inmates free to enjoy all written forms of sexually explicit material. *See id.,* n. 7.

Moving on, the court explained that the third factor, impact on others, is essentially a restatement of the first. It noted that if Congress could have concluded rationally that pornography "increases the risk of prison rape," then accommodating a right to pornography could have a substantial adverse impact on others within the prison. *See id.*

Addressing the final question, whether there were any obvious alternatives, the court rejected the proposition that prison officials could sift through materials on an individualized basis depending on the needs and limitations of the inmate. Aside from the burdensome administrative costs, this approach would place too much discretion into the hands of officials and would not stop inmates from exchanging materials with one another. *See id.*

### 4. Other decisions

Other federal courts have upheld less ambitious bans on the distribution of explicit material in prisons. *See, e.g., Thornburgh,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459; *Frost,* 197 F.3d at 358 (upholding regulation banning sex-based publications depicting only "actual penetration"); *Waterman,* 183 F.3d 208 (upholding ban on receipt of sexually explicit materials by "repetitive and compulsive" pedophiles); *Owen,* 117 F.3d 1235; *Trapnell v. Riggsby,* 622 F.2d 290 (7th Cir. 1980). In *Thornburgh,* 490 U.S. at 405 n. 6, 109 S.Ct. 1874, the Supreme Court upheld Bureau of Prison regulations that prohibited, on the basis of individual determinations, material featuring child pornography, bestiality, and homosexual or sado-masochistic acts, among other things. The "individualized nature of the determinations required by the regulation" persuaded the Court that the regulation passed muster under the first factor of the *Turner* test. *Id.* at 416, 109 S.Ct. 1874; *see also Amatel,* 156 F.3d at 212 (Wald, J., dissenting) (discussing significance of individualized determinations in *Thornburgh* ); *Owen,* 117 F.3d at 1237 (relying on *Thornburgh* in upholding individualized determination while cautioning that "a blanket ban on nude photographs would be unconstitutional").

*Trapnell,* 622 F.2d at 292, concerned a regulation prohibiting inmates from possessing sexually explicit photographs of their girlfriends or wives. *See Id.* The Seventh Circuit concluded that the regulation was content-neutral because prison officials did not create it to take a moral

stance on pornography. *See id.* at 293. One aspect of the case is of particular relevance here. The Seventh Circuit relied on a policy statement accompanying the regulation when reaching the conclusion that the regulation furthered the prison's interest in maintaining security. This statement explained that personal nude photographs

> are considered highly emotionally charged items.... If such photographs were viewed by other inmates, conflicts or assaults are likely to result ... Since this population is primarily long-term offenders with assaultive patterns of behavior and considered to have high propensity toward violence, regulations must be established in this area for the safekeeping of both staff and inmates.

*Trapnell,* 622 F.2d at 293. By relying on the findings and reasoning articulated in this policy statement, the court adhered to the precept that "[i]t is critically important ... that the record reveal the manner in which security considerations are implicated by the prohibited activity." *Caldwell v. Miller,* 790 F.2d 589, 597 (7th Cir.1986). *See also Reed v. Faulkner,* 842 F.2d 960 (7th Cir.1988) (on the basis of record before court, notion that wearing dreadlocks would lead to racial violence in prison amounts to "the piling of conjecture upon conjecture"); *Campbell v. Miller,* 787 F.2d 217, 227 n. 17 (7th Cir.1986) ("deference to the administrative expertise and discretionary authority of correction officials must be schooled, not absolute"); *Betts v. McCaughtry,* 827 F.Supp. 1400, 1406–07 (W.D.Wis.1993), *aff'd,* 19 F.3d 21 (7th Cir. 1994) (table).

5. *The Wisconsin regulation*

■ The regulations at issue in *Thornburgh, Frost, Mauro, Waterman, Amatel,* and *Trapnell* prohibited a much narrower range of materials than the regulations at issue in this case. *See Thornburgh,* 490 U.S. at 405 n. 5, 109 S.Ct. 1874 (policy generally limited to individualized determinations banning child pornography, bestiality, sado-masochism and homosexual acts between members of the same sex as the prison population); *Frost,* 197 F.3d 348 (policy limited to visual depictions of penetration); *Mauro,* 188 F.3d 1054 (policy limited to visual depictions of frontal nudity); *Waterman,* 183 F.3d 208 (policy limited to repeat, compulsive pedophiles); *Amatel,* 156 F.3d 192 (policy limited to publications with visual depictions that "feature" nudity without redeeming social value); *Trapnell,* 622 F.2d 290 (policy limited to personal sexually explicit photographs). This difference affects each step of the *Turner* analysis. A comparison with *Mauro* and *Amatel* is illustrative because these cases involved the broadest prohibitions.

Although the Wisconsin regulation is aimed at the same legitimate objectives as the policies in *Mauro* and *Amatel* (security, rehabilitation and the reduction of harassment of female officers) and is neutral in the technical *Turner* sense because distinctions are drawn on the basis of furthering those objectives rather than to suppress expression on the basis of its ideological content, it is much less clear whether the Wisconsin regulation is related rationally to its objective. It is undoubtedly true that the debate among scholars and experts on the effect of "pornography" on security, rehabilitation and sexual harassment of female guards means that the state could have concluded rationally that there is a rational relationship, meaning that a regulation banning "pornography" must be upheld. *See Amatel,* 156 F.3d at 201 ("For judges seeking only a reasonable connection between legislative goals and actions, scientific indeterminacy is determinative."). However, although defendants insist that there is a rational connection between banning "the materials" prohibited by the regulation and furthering these legitimate objectives, they fail to explain which materials they mean. It is difficult to imagine, for example, that the drafters believed that rehabilitation is impeded by depictions of the Sistine Chapel, but it is possible to imagine that they believed that depictions of bestiality did not advance rehabilitation.

Defendants have neither disavowed interpretations and applications of the regulation banning depictions of Michelangelo's Sistine Chapel (and they could not, given the literal reading of the regulation) nor articulated a rational connection between the prohibition of such sacred works and increasing security and rehabilitation and decreasing sexual harassment. Because defendants do not disavow applications of the regulation prohibiting depictions of the Sistine Chapel, I assume defendants thought that rehabilitation would be furthered by banning those depictions as well as depictions of bestiality. If so, they have failed to submit any credible evidence from which a trier of fact could conclude reasonably there is such a connection. The record in this case reveals no debate among scholars or experts on the effect on rehabilitation of great works of art and literature and intimate love letters between spouses; and common sense suggests none. This is not a matter of the state choosing rationally between opposing but reasonable views. In the absence of both scientific or expert credible evidence and common sense, a trier of fact could conclude reasonably that there is no rational connection between the asserted objectives and the ban. A trier of fact could conclude reasonably that such excesses are grounds for invalidation. *See Amatel,* 156 F.3d at 201 ("... improbable excesses of a statute are not a ground for invalidation before application shows their reality").

Of course, much of the material prohibited by the Wisconsin regulation is supported by a rational connection between the ban and its legitimate objectives. *See id.* at 199 ("We think that the government could rationally have seen a connection between pornography and rehabilitative values."). For example, no one disputes that the state may conclude rationally that sexually explicit photographs of wives and girlfriends could jeopardize security and that the rehabilitation of some offenders may be hampered by the presence of some forms of sexually explicit material. There is no doubt that defendants could craft and implement a regulation similar to those

upheld in the cases discussed above. However, the Wisconsin regulation in effect sweeps so broadly as to capture much pictorial and written material for which there is no such rational connection.

Indeed, if defendants interpret the regulation to ban Michelangelo, logic suggests the regulation prohibits access to such great works of literature as the Bible and the writings of Walt Whitman, as well as countless others whose depictions of nudity and sexual intimacy are enlightening and inspiring rather than "degrading and disrespectful." *Amatel,* 156 F.3d at 199. *See, e.g., 2 Samuel* 11:1–5 (King James) ("... he saw a woman washing herself; and the woman was very beautiful to look upon .... she came in unto him, and he lay with her ..."); *Song of Solomon,* 7:1–10 (King James) ("Thy navel is like a round goblet ... thy belly like wheat set about with lilies ... thy stature is like to a palm tree, and thy breasts to clusters of grapes ... I will take hold the boughs thereof ..."). The decision to ban an entire book because of a single awkward reference on page 127 to "handl[ing] ... a shaft of smooth ivory ... during the act of copulation" suggests that Whitman's more lyrical *Leaves of Grass* would also be banned. *See* Walt Whitman, *Song of Myself,* § 24 (Galway Kinnell ed., Ecco Press 1987) ("Copulation is no more rank to me than death is.... If I worship one thing more than another ... firm masculine coulter, it shall be you."). In short, as defendants apparently interpret their regulation, much of the great work of western art and literature must be kept from prisoners, allegedly to promote rehabilitation, increase security and protect female officers. Defendants have suggested no rational connection between so broad a ban and neither defendants' stated goals nor common sense suggests any (in fact, in the case of works such as the Bible, common sense suggests the opposite). Although an "exact fit" between the policy and its objective is not required, a rational connection is, and one cannot be found here.

In addition, the breadth of the Wisconsin ban reduces or eliminates alternative means of exercising the right in question, which the court described as the "right to receive sexually explicit communications" in *Mauro*, 188 F.3d at 1061. By failing to include limitations the courts of appeals found significant in *Mauro* and *Amatel*, the Wisconsin regulation reveals its deficiencies. For example, the regulation at issue in *Mauro* applied only to visual depictions of frontal nudity. *See id.* at 1061. Unlike the Wisconsin regulation, it did not apply to any written material, such as sexually intimate love letters between inmates and their spouses and sexually explicit magazine articles and books, *see id.*, or to magazines that contain the occasional advertisement showing a portion of the breast of an otherwise fully-clothed woman. The court of appeals cited the availability of these types of materials in holding that the inmates had alternative means through which they could exercise their right. *See id.* No such alternative is available under the Wisconsin regulation.

Moreover, the Wisconsin regulation does not embody any of the limitations considered significant by the majority in *Amatel*. Specifically, the regulation is not restricted solely to pictures; it applies to any publication, regardless how frequently the publication features "injurious" material; and there are no exceptions for objectionable material that has some redeeming social value. Indeed, in *Amatel*, the court of appeals took pains to explain that no prison official had attempted to implement a "bizarre interpretation" of the regulation such as banning the work of Michelangelo, and noted that such innocuous publications as *National Geographic*, the *Sports Illustrated* swimsuit issue and the *Victoria's Secret* catalog were exempted specifically from the regulation. *Id.*, 156 F.3d at 202. Not so in Wisconsin: not only have those publications been prohibited, but even the "bizarre interpretation" the court of appeals feared has come to pass in the banning of the work of Michelangelo. Moreover, the prohibition on sexually intimate love letters between husbands and wives

seems to block rather than enhance the alternative means of "channeling of sexual expression into long-term relationships of caring and affection, of joining eros to agape," an interest the court of appeals in *Amatel* recognized as both legitimate and served by the regulation banning pictorial depictions of nudity and sex. *Amatel*, 156 F.3d at 199.

Defendants concede that inmates in possession of written material that violates the regulation are subject to discipline, even if they wrote the material themselves. Presumably, therefore, even such alternative means of expressing sexual intimacy as recording one's thoughts in a diary are prohibited by the regulation. Neither expert testimony nor common sense suggests why allowing an inmate to commit his or her own private sexual thoughts to a diary jeopardizes security or rehabilitation or causes the harassment of female guards. A trier of fact could conclude reasonably that there is no rational connection between enhancing prison security and inmate rehabilitation and a policy that allows such "overregulation and invasion of the innermost recesses of the human mind and spirit." *Amatel* 156 F.3d at 210 (Wald, J., dissenting).

Turning to the third *Turner* factor, impact on others, it is difficult to understand how the presence of such materials as depictions of the ceiling of the Sistine Chapel has a significant negative impact on others within the prison. Again, some materials prohibited by the rule may have such an effect but, as interpreted and applied by defendants, the Wisconsin regulation encompasses many that do not.

Finally, unlike the regulations in *Mauro* and *Amatel*, a trier of fact could reasonably conclude that the Wisconsin regulation is an "exaggerated response" to the state's concerns. Numerous courts of appeal have recognized the state's legitimate concern that the presence of pornography among offenders may hamper rehabilitation, particularly sex offenders, threaten security and lead to increased incidence of sexual harassment of female officers. As

decisions such as *Mauro* and *Amatel* reveal, many prison systems have adopted constitutionally viable restrictions on prisoner access to such materials. A trier of fact could reasonably conclude, however, that a regulation is an exaggerated response to those concerns when it bans not only such things as visual depictions of child sexuality, bestiality, sado-masochism and even frontal nudity, but also depictions of the Sistine Chapel (presumably verbal as well as visual, for the regulation prohibits both) and, potentially, the Bible and significant portions of the great works of art and literature. In short, a trier of fact could conclude reasonably that the Wisconsin regulation "sweeps much more broadly that can be explained by [defendants'] penological objectives." *Turner,* 482 U.S. at 98, 107 S.Ct. 2254.

It is true, as defendants argue, that it is plaintiffs' burden to suggest an obvious, easily accommodated alternative to the regulation. *See O'Lone,* 482 U.S. at 350, 107 S.Ct. 2400; *Turner,* 482 U.S. at 91, 107 S.Ct. 2254. However, I agree with plaintiffs that, in the absence of evidence that the opportunity to read and examine important works of art and literature and private writings jeopardizes security and rehabilitation, there are a number of obvious potential *de minimus* cost alternatives that would accomplish the regulation's legitimate objectives but spare the First Amendment.

Neither scientific nor expert testimony nor common sense provides a basis for the conclusion that a ban on such materials as important works of art and literature, sexually intimate love letters between spouses and private diary entries jeopardizes security, hampers the rehabilitation of most prisoners or increases harassment of female guards. The record does not show that plaintiffs have an adequate alternative means to exercise their First Amendment rights. There is no credible record evidence that accommodating plaintiffs' rights to see, read and write such materials has a significant negative effect on others within the prisons. A trier of fact could conclude reasonably that the regulation is an exaggerated response to the state's legitimate concerns and that obvious, *de minimus* cost alternatives are available. In sum, under *Turner,* a trier of fact could conclude reasonably that the enacters of the Wisconsin regulation could not have concluded rationally that the regulation is related reasonably to legitimate penological interests. Accordingly, I will deny defendants' motion for summary judgment. I cannot find that the regulation is not an impermissible violation of plaintiffs' rights protected by the First Amendment. *See Turner,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64.

### C. Due Process

█ At times defendants seem to hedge their bets regarding their broadest interpretations and applications of the regulation by arguing that mistakes are inevitable and that consistency is a product of time, without actually disavowing any particular interpretation or application. To the extent that the defendants disavow the most troubling applications of the regulation, it lends significant credence to plaintiffs' argument that the regulation is unconstitutionally vague in violation of the due process clause of the Fourteenth Amendment. *See City of Chicago v. Morales,* 527 U.S. 41, 52, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (enactment may be impermissibly vague even if it does not reach substantial amount of constitutionally protected conduct). There are two ways in which a statute or regulation "can operate in an unconstitutionally vague manner." *Karlin v. Foust,* 188 F.3d 446, 458 (7th Cir.1999). First, it can fail to provide "fair warning" regarding what conduct violates the regulation. *Id.* Second, it can fail to provide those charged with enforcing it with an "explicit and ascertainable standard" to prevent its enforcement in arbitrary manner. *Id.* at 459.

Relying on the opinion of the Court of Appeals for the Third Circuit in *Waterman,* 183 F.3d at 213, defendants argue that the court should not conduct a separate vagueness analysis under the Fourteenth Amendment because "if the chal-

lenged statute withstands review under *Safley*, it does not violate the Constitution." With respect, I join the Courts of Appeals for the Ninth Circuit and District of Columbia in disagreeing with the Third Circuit's analysis. *See Mauro*, 188 F.3d at 1060, n. 5 (analyzing challenged regulation under vagueness doctrine); *Amatel*, 156 F.3d at 203 (remanding case for determination whether challenged regulation was unconstitutionally vague despite upholding regulation under *Turner* test). Although there is a close link between the questions whether the regulation is related reasonably to legitimate penological interests and whether it is so vague that it fails to provide fair warning to prisoners and an ascertainable standard to mailroom employees, these inquiries are distinct. The first assumes that defendants have given a clear meaning to the regulation through their interpretation and application of it and asks whether such a regulation is permissible under the First Amendment; the second assumes that defendants disavow applications of the regulation that are impermissible under the First Amendment and asks whether the regulation is so vague that it fails to provide fair warning to prisoners and ascertainable standards to department employees.

If defendants disagree with the manner in which the regulation has been applied by the department's front line employees, then a trier of fact could conclude reasonably that the regulation fails to provide those charged with enforcing it with an "explicit and ascertainable standard" to prevent its enforcement in arbitrary manner. *Karlin*, 188 F.3d at 459. On this basis, the Wisconsin regulation differs markedly from the "bright-line rule" banning frontal nudity scrutinized in *Mauro*, which the court of appeals found "not only limit[ed] the discretion available to jail employees, but also ensure[d] consistency in the exclusion of materials.... [J]ail employees must simply determine whether the material in question contains frontal nudity; if it does, it is prohibited under the policy." *Id.* at 1060, n. 4. This difference is not surprising given the general language of the Wisconsin regulation compared to the clear prohibition of frontal nudity at issue in *Mauro*. Similarly, in *Amatel*, the court of appeals evaluated the constitutionality of a regulation that was much more specific than Wisconsin's. Nonetheless, the court did not uphold the challenged regulation against the plaintiff's vagueness challenge, but rather noted that the vagueness claim "may have independent force" and remanded the question to the district court. *Amatel*, 156 F.3d at 203.

In short, defendants cannot have it both ways: either they stand by their interpretations and applications of the regulation banning such materials as a depiction of the Sistine Chapel and sexually intimate love letters between spouses, in which case a trier of fact could reasonably conclude the regulation is not rationally connected to a legitimate penological interest and thus violates plaintiffs' rights protected by the First Amendment or they disavow such interpretations, in which case a trier of fact could reasonably conclude that the regulation is so vague that it fails to provide those charged with enforcing it with an "explicit and ascertainable standard" to prevent arbitrary enforcement and thus violates plaintiffs' rights protected by the due process clause of the Fourteenth Amendment.

## II. *MOTION TO CORRECT TWO CITATION ERRORS*

Plaintiffs have moved to correct two citation errors in their proposed findings of fact. Defendants object, contending that the citations fail to support the facts for which they are cited. The appropriate procedure for defendants to place plaintiffs' proposed findings of fact into dispute is by a reply accompanied by record evidence. *See Procedure to be Followed on Motions for Summary Judgment* at III.A.1. Defendants' objections are noted, but plaintiffs' motion will be granted.