[No. F058113. Fifth Dist. June 11, 2010.]

In re EDWARD T. FURNACE on Habeas Corpus.

650

COUNSEL

Edward T. Furnace, in pro. per.; and Melanie K. Dorian, under appointment by the Court of Appeal, for Petitioner Edward T. Furnace.

Edmund G. Brown, Jr., Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca, Krista L. Pollard and Brian Kinney, Deputy Attorneys General, for Respondent State of California.

OPINION

DAWSON, J.—Petitioner Edward T. Furnace, who is serving a life term without the possibility of parole for special circumstance murder and other crimes, was validated as an associate of a prison gang, the Black Guerrilla Family (BGF), and transferred into the security housing unit (SHU) at California State Prison, Corcoran. He argues that the evidence used to validate him and place him in the SHU for an indeterminate term was "false, unreliable and insufficient." We will deny his petition for writ of habeas corpus.

## FACTS AND PROCEDURAL HISTORY

Furnace has been in the custody of the California Department of Corrections and Rehabilitation (Department) since 1992. On February 4, 2008, while Furnace was incarcerated at Salinas Valley State Prison (SVSP), the institutional gang investigators (IGI) unit searched his personal property. Thereafter, assistant investigator M. Valdez authored a report stating he had discovered contact information related to the BGF prison gang. The item, a piece of paper, included the name, Department number, and institutional housing information of Hugo Pinell, a validated member of the BGF housed at Pelican Bay State Prison. Valdez stated his opinion, based on his training and experience, that associates of the BGF "will often keep contact information belonging to BGF members in their personal property . . . so that BGF associates can establish a line of communication with which to discuss BGF gang activity occurring at their respective institutions." Thus, according to Valdez, the contact information found in Furnace's property was indicative of gang activity and established a direct link with a validated BGF member.

Also found in Furnace's personal property was a book entitled Fascism: its most advanced form is here in America (1971) by George L. Jackson. A brief history of the life and death of George L. Jackson appears on the inside front and back covers of the book. Inside the cover, the book is titled Revolutionary Armed Struggle, and outlines the formation and function of a guerrilla

group. Also found was an audio compact disc (CD) entitled "Prisons on Fire: George Jackson, Attica & Black Liberation." The CD reviewed the life and death of George L. Jackson and outlined his ideology. It contained the titles "Soledad Brothers," "Marin County Rebellion," "August 21, 1971" (the day George L. Jackson died), "Remembering George," "George's Legacy" and "In Solidarity with George." According to Valdez, the BGF prison gang was established under the example and teachings of George L. Jackson; the gang was founded after Jackson's death; and Jackson is viewed as a martyr for the BGF ideology. Valdez further asserts the BGF constitution repeatedly references George L. Jackson and states, in part, " 'Climaxing with the revolutionary socialist and equalitarian freedom fighters under the guiding example and teachings of George L. Jackson, we ultimately became the "Black Guerrilla Family." ' " Valdez stated that books on George L. Jackson are kept by BGF associates while they are being indoctrinated with the ideology of the BGF. Thus, in Valdez's view, the book and CD found in Furnace's property also were indicative of BGF gang activity.

Two additional items were found in Furnace's property: a photocopied flyer promoting a 2005 Black August event in Oakland, California and a photocopied newspaper article explaining the meaning of Black August. According to Valdez, Black August was established in 1979 by the second supreme commander of the BGF after the death of the inmate who was recognized as the first supreme commander of the BGF, and it was meant to honor "the fallen BGF members as well as other individuals viewed as Freedom Fighters who were killed throughout the years during the month of August." The flyer promoting the 2005 Black August event contained pictures of a dragon and of George L. Jackson, both recognized symbols of the BGF. The article on Black August encouraged the public to attend the rally and learn how to become involved in the movement to free Hugo Pinell, the aforementioned BGF prison gang member whose name and other information was found in the possession of Furnace. Valdez opined that such documents also are used by the BGF to indoctrinate with its ideology inmates it is recruiting for membership.

On April 29, 2008, the SVSP IGI unit submitted a validation package to the Office of Correctional Safety for review and approval in order to validate Furnace as an associate of the BGF prison gang.

On May 2, 2008, pursuant to the Department's procedures, Valdez met with Furnace regarding the evidence being used in his validation as an associate of the BGF. Furnace insisted that he was not a gang member or associate. In the interview, Furnace claimed he had the information on Pinell because he was going to contact him regarding research for a children's book he was writing on staying away from gangs and prison. When asked about

the pictures of George L. Jackson, Furnace stated " 'It's just a book,' " and that the book did not make him a BGF member any more than reading Stalin made him a communist or reading the Koran made him Al Qaeda. As for the documents regarding Black August, Furnace stated to Valdez he did not know anything about the BGF, but that they were " 'just newspaper articles' " from a public newspaper. Valdez informed Furnace that he did not find the entire newspaper in Furnace's possession, just the articles pertaining to Black August.

On May 4, 2008, Furnace filed an inmate appeal alleging he was not a gang member or associate and that the books and CD used as evidence to validate him as a gang member/associate were "purchased at, approved by, and issued to [him] by SVSP property staff after their inspection." He also alleged that neither the Department nor SVSP had ever promulgated a list of banned books or CD's which, if found in a prisoner's possession, could be used to validate a prisoner as a gang member. Furnace further alleged that the copies of newspaper articles relied upon were taken from a public news source.

On May 21, 2008, the Office of Correctional Safety accepted the information submitted by the IGI unit and validated Furnace as a BGF associate. Furnace's subsequent administrative appeal was denied.

On April 14, 2009, Furnace filed a petition for writ of habeas corpus in the Kings County Superior Court. That court denied the petition, and Furnace filed the petition here on July 22, 2009. We initially sought an informal response from the Attorney General on behalf of the Department, addressing the factual and legal bases for Furnace's validation as a BGF associate. After consideration of the petition and the informal response filed by the Attorney General, we issued an order to show cause why the relief requested should not be granted.

## DISCUSSION

■ "The Legislature has given the Director of the Department of Corrections broad authority for the discipline and classification of persons confined in state prisons. (Pen. Code, §§ 5054, 5068.) This authority includes the mandate to promulgate regulations governing administration, classification and discipline." (*In re Lusero* (1992) 4 Cal.App.4th 572, 575 [5 Cal.Rptr.2d 729].)

■ The California Code of Regulations, title 15, section 3000[1] defines a "prison gang" as any gang with its roots or origins within the Department or

---

[1] All further regulatory references are to title 15 of the California Code of Regulations.

any other prison system. "Gangs, as defined in section 3000, present a serious threat to the safety and security of California prisons," and "[i]nmates and parolees shall not knowingly promote, further or assist any gang as defined in section 3000." (§ 3023, subds. (b), (a).)

Section 3378, subdivision (c) requires that, to validate an inmate as an associate of a prison gang, the Office of Correctional Safety identify at least three independent source items indicative of association with validated gang members or associates.[2] In addition, at least one of the source items must constitute a direct link to a current or former validated member or associate of the gang. (§ 3378, subd. (c)(4).) Section 3378, subdivision (c)(8) provides that the "source items" for determining gang membership/association "shall be based on the following criteria:

"(A) Self admission. . . .

"(B) Tattoos and symbols. Body markings, hand signs, distinctive clothing, graffiti, etc., which have been identified by gang investigators as [being] used by and distinctive to specific gangs. Staff shall describe the tattoo or symbol and articulate why it is believed that the tattoo is used by and distinctive of gang association or membership. . . .

"(C) Written material. Any material or documents evidencing gang activity such as the membership or enemy lists, constitutions, organizational structures, codes, training material, etc., of specific gangs. . . .

---

[2] Section 3378, subdivision (c) reads in part as follows:

"Gang involvement allegations shall be investigated by a gang coordinator/investigator or their designee.

"(1) CDC Form 812-A or B shall be completed if an inmate/parolee has been verified as a currently active member/associate, inactive member/associate or dropout of a gang (prison gang or disruptive group) as defined in section 3000. Current activity is defined as any documented gang activity within the past six (6) years consistent with section 3341.5(c)(5).

"(2) Information entered onto the CDC Form 812-A or B shall be reviewed and verified by a gang investigator to ensure that the identification of an inmate/parolee as a currently active gang member or associate is supported by at least three independent source items in the inmate/parolee's central file. The independent source items must contain factual information or, if from a confidential source, meet the test of reliability established in section 3321. . . .

"(3) A member is an inmate/parolee who has been accepted into membership by a gang. This identification requires at least three (3) independent source items of documentation indicative of actual membership. Validation of an inmate/parolee as a member of a prison gang shall require that at least one (1) source item be a direct link to a current or former validated member or associate of the gang.

"(4) An associate is an inmate/parolee who is involved periodically or regularly with members or associates of a gang. This identification requires at least three (3) independent source items of documentation indicative of association with validated gang members or associates. Validation of an inmate/parolee as an associate of a prison gang shall require that at least one (1) source item be a direct link to a current or former validated member or associate of the gang."

"(D) Photographs. Individual or group photographs with gang connotations such as those which include insignia, symbols, or validated gang affiliates. . . .

"(E) Staff information. Documentation of staff's visual or audible observations which reasonably indicate gang activity. . . .

"(F) Other agencies. Information evidencing gang affiliation provided by other agencies. . . .

"(G) Association. Information related to the inmate/parolee's association with validated gang affiliates. Information including addresses, names, identities and reasons why such information is indicative of association with a prison gang or disruptive group. . . .

"(H) Informants. . . .

"(I) Offenses. Where the circumstances of an offense evidence gang affiliation such as where the offense is between rival gangs, the victim is a verified gang affiliate, or the inmate/parolee's crime partner is a verified gang affiliate. . . .

"(J) Legal documents. Probation officer's report or court transcripts evidencing gang activity. . . .

"(K) Visitors. Visits from persons who are documented as gang 'runners', or community affiliates, or members of an organization which associates with a gang. . . .

"(L) Communications. Documentation of telephone conversations, conversations between inmates, mail, notes, greeting cards, or other communication, including coded messages evidencing gang activity. . . .

"(M) Debriefing reports. . . ."

■ Section 3341.5, subdivision (c) provides that an inmate whose conduct endangers the safety of others or the security of the institution shall be housed in the SHU, and subdivision (c)(2) provides that assignment to the SHU may be for either an indeterminate or a fixed period of time. Section 3341.5, subdivision (c)(2)(A)2 provides, as relevant here, that "a validated prison gang member or associate is deemed to be a severe threat to the safety of others or the security of the institution and will be placed in a SHU for an indeterminate term."

Furnace contends the source items relied upon to validate him as an associate gang member and place him in the SHU are insufficient. He further contends that his First Amendment rights have been violated by use of protected materials—the book, CD, and newspaper articles—to validate him as a BGF associate.

## 1. Standard of Review

Judicial review of a Department custody determination is limited to determining whether the classification decision is arbitrary, capricious, irrational, or an abuse of the discretion granted to those given the responsibility for operating prisons. (*In re Wilson* (1988) 202 Cal.App.3d 661, 667 [249 Cal.Rptr. 36].) In *Superintendent v. Hill* (1985) 472 U.S. 445 [86 L.Ed.2d 356, 105 S.Ct. 2768], the United States Supreme Court considered the necessary quantum of evidence to satisfy the demands of due process: "We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board . . . . This standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced . . . .' [Citation.] Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." (*Id.* at pp. 455–456.) The issue is simply whether the evidence in question permits a court to conclude that the administrator had reasons for his or her decision. (See *In re Zepeda* (2006) 141 Cal.App.4th 1493, 1500 [47 Cal.Rptr.3d 172]; see also *In re Lawrence* (2008) 44 Cal.4th 1181, 1213 [82 Cal.Rptr.3d 169, 190 P.3d 535] [parole decisions "must be supported by some *evidence*, not merely by a hunch or intuition"].)

## 2. Is the Validation Supported By "Some Evidence"?

### A. Disciplinary Rule Violation

■ Furnace contends he was not issued a disciplinary rule infraction for " 'gang' or 'gang activity' " and therefore could not be validated as a gang member. "In interpreting regulations, the court seeks to ascertain the intent of the agency issuing the regulation by giving effect to the usual meaning of the language used so as to effectuate the purpose of the law, and by avoiding an interpretation which renders any language mere surplusage. [Citation.]" (*Modern Paint & Body Supply, Inc. v. State Bd. of Equalization* (2001) 87 Cal.App.4th 703, 708 [104 Cal.Rptr.2d 784].)

■ Furnace's interpretation finds no support in the language of section 3378. That section provides that an associate gang member is one "who is

involved periodically or regularly with members or associates of a gang," and gang classification as an associate requires "at least three (3) independent source items of documentation indicative of association with validated gang members or associates," and "at least one (1) source item [must] be a direct link to a current or former validated member or associate of the gang." (§ 3378, subd. (c)(4).) There is no requirement in section 3378 that a prisoner be issued a disciplinary rule infraction for gang activity before being validated as a gang associate. If the Department intended such a prerequisite, it would have stated the requirement in section 3378.

### B. *Independent Source Items*

In the present case, the evidence was provided by three independent "source items," one of which was a "direct link to a current or former validated member or associate of the gang." (§ 3378, subd. (c)(4).) According to the declaration of Everett W. Fischer, special assistant to the assistant secretary of the Office of Correctional Safety, the BGF prison gang is a "highly dangerous and notorious prison gang . . . formally recognized as one of the original California prison gangs by the Department Operations Manual section 52070.17.2." According to Fischer, the BGF is known for the violent courtroom escape of three California prisoners from a Marin County courtroom in 1970, along with the kidnapping of the trial judge and prosecutor in the case. It is also known for George L. Jackson's failed prison escape attempt in 1971, which resulted in the killing of three California correctional officers. The BGF was founded by George L. Jackson, and Black August was established to honor fallen BGF affiliates. According to Fischer, ". . . B[GF] affiliates almost always have materials discussing George Jackson and Black August. These materials, which discuss the organization's founder and its history, are essential for indoctrinating new B[GF] affiliates. And, due to the importance the B[GF] places on these materials, other inmates know that possession of these materials is a signal of their affiliation with the B[GF]. . . . [¶] . . . B[GF] affiliates are likely to have the contact information for other B[GF] affiliates. Prison gangs are criminal organizations that must communicate with their affiliates to conduct gang business, ensure group solidarity, and recruit and train new affiliates. Indeed, one of the primary duties of a gang affiliate is to establish a line of communication between himself and other gang affiliates. To disrupt gang communications, prison officials restrict correspondence between inmates, and are especially restrictive of the correspondence of validated gang affiliates housed in a security housing unit. And inmates are aware that correspondence directed to inmates housed in a security housing unit is prohibited . . . . Even though a gang affiliate may not directly correspond with a validated gang member housed in a security housing unit, a validated B[GF] member's address may still be used to communicate with the validated inmate. Prison gang affiliates use third parties to pass messages by sending the contact information for the

validated inmate along with a coded message to the third party. The third party then sends the coded message to the validated inmate. Because the third party is a member of the general public, prison officials are limited in their ability to block the coded message."

As explained by Fischer, the gang validation package for Furnace consisted of the following "source items" pursuant to section 3378, subdivision (c)(8): the address for a validated BGF member, an audio CD (with pictures of George L. Jackson on it), a book on the formation and function of a guerrilla group, a flyer for the 2005 Black August event, and a newspaper article promoting Black August. According to Fischer, the address demonstrated a direct link between Furnace and a validated BGF member. "Although the indoctrination materials alone would have been insufficient to validate Furnace as a gang affiliate, the combination of the book, flyer, newspaper article, pictures, CD, and the address of a known gang member demonstrate that Furnace is an associate of the B[GF]."

Furnace contends the piece of paper found in his possession, which contained the contact information for Hugo Pinell, did not provide evidence of a "direct" link with another BGF associate or member, as required by section 3378, subdivision (c)(4). While neither the statute nor case authority specifically defines the term, the dictionary defines "direct" as meaning, among other things "without interruption or diversion," and "without any intervening agency or step." (Webster's 3d New Internat. Dict. (1986) p. 640, col. 2.)

The piece of paper found in Furnace's possession included the name, Department number, and institutional housing of Hugo Pinell, a validated member of the BGF housed at Pelican Bay State Prison. According to Fischer, communication from Furnace to Pinell would violate prison rules. Further, it is apparent that Furnace knew Pinell was a member of the BGF; Pinell's name was included in the article also found in Furnace's possession. In addition, according to Fischer, it is common knowledge among inmates that Pelican Bay State Prison houses validated prison gang affiliates. We find the relevance of this link between Furnace and Pinell to be evident without the addition of any intervening agency or step. Thus, we agree with Fischer that "the address[] demonstrated a direct link between Furnace and a validated B[GF] member."[3]

---

[3] To offer an example of what would clearly constitute an indirect link: If inmate A possessed contact information for inmate B who, in turn, possessed contact information for inmate C, a gang member, the link between inmates A and C would not be direct. The significance of the link between inmates A and C would not be evident without the addition of some further step or information.

Furnace also contends the "direct link" requirement "must relate to the subject gang or its activities," and that there was no such evidence here. But in addition to the address and contact information for Pinell, Furnace was also in possession of a number of items, namely, the book, flyer, newspaper article, pictures, and CD, all on the subject of George L. Jackson, the founder of the BGF, and the Black August movement, which is meant to honor fallen BGF members. These items, combined adequately, "relate to the subject gang or its activities." Although section 3378, subdivision (c)(4) requires three "independent" source items, it is nonetheless appropriate to consider the interplay of the source items in determining whether there is some evidence of gang activity.

Finally, Furnace contends that the book and CD containing pictures of George L. Jackson do not qualify as a "tattoos and symbols" source item.

■ Section 3378, subdivision (c)(8)(B) defines tattoos and symbols as "[b]ody markings, hand signs, distinctive clothing, graffiti, etc., which have been identified by gang investigators as [being] used by and distinctive to specific gangs. Staff shall describe the tattoo or symbol *and articulate why it is believed that the tattoo is used by and distinctive of gang association or membership*." (Italics added.) The italicized language in that section has two necessary and separate requirements before a symbol may be used to validate gang membership: The first is that the gang investigator "believed that the tattoo is used by and distinctive of gang association or membership." The second separate and necessary requirement is that the gang investigator "articulate *why* [the investigator holds that belief]." (§ 3378, subd. (c)(8)(B), italics added.)

Gang expert Valdez complied with the first requirement of section 3378, subdivision (c)(8)(B) when he "identified" the pictures of George L. Jackson and a dragon in the materials possessed by Furnace "as being used by and distinctive to [a] specific gang[]"—the BGF. (*Ibid.*)

Valdez complied with the second requirement of section 3378, subdivision (c)(8)(B)—"why" he believed those pictures were gang related—when he explained as follows: the BGF prison gang was established under the example and teachings of George L. Jackson; the gang was founded after Jackson's death; Jackson is viewed as a martyr for the BGF ideology; the BGF constitution repeatedly references George L. Jackson and states, in part, " 'Climaxing with the revolutionary socialist and equalitarian freedom fighters under the guiding example and teachings of George L. Jackson, we ultimately became the "Black Guerrilla Family" ' "; and books on George L. Jackson are kept by BGF associates while they are being indoctrinated with the ideology of the BGF.

Furnace has offered innocent explanations for his possession of the various source items used to validate him as a BGF associate. The existence of a nonincriminating explanation for a source item, however, is irrelevant to this court's "some evidence" review. Neither is it appropriate for this court to weigh conflicting evidence. (*Superintendent v. Hill, supra,* 472 U.S. at pp. 455–456; cf. *People v. Bradford* (1997) 15 Cal.4th 1229, 1329 [65 Cal.Rptr.2d 145, 939 P.2d 259] [" " " "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' "].)

We conclude the "some evidence" necessary to support Furnace's validation is present in the record.

3. *Were Furnace's First Amendment Rights Violated by Use of Protected Material to Validate Him*

We next address Furnace's claim that he was improperly validated as a gang member based, in part, on "approved books and a news paper article." He relies on Penal Code section 2601, subdivision (c)(1) to support his argument that use of those items to support his validation violated his First Amendment rights.[4]

■ When addressing a prisoner's constitutional challenge, we necessarily frame our analysis with "two basic and potentially competing principles." (*Mauro v. Arpaio* (9th Cir. 1999) 188 F.3d 1054, 1058.) First, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." (*Turner v. Safley* (1987) 482 U.S. 78, 84 [96 L.Ed.2d 64, 107 S.Ct. 2254] (*Turner*).) Second, " 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' [Citation.]" (*Ibid.*) For this reason, a prison regulation impinging on constitutional rights may withstand scrutiny when "the regulation . . . is reasonably related to legitimate penological interests." (*Id.* at p. 89.)[5] Applying this principle, *Turner* upheld a prison rule barring correspondence between adult prisoners as a valid tool for controlling prison gangs. (*Turner,* at p. 91.)

---

[4] Penal Code section 2601, subdivision (c)(1) provides, in pertinent part, that a prisoner retains the right "[t]o purchase, receive, and read any and all newspapers, periodicals, and books accepted for distribution by the United States Post Office." But it also provides, "Pursuant to this section, prison authorities may exclude any of the following matter: [¶] . . . [¶] (B) Any matter of a character tending to incite murder, arson, riot, violent racism, or any other form of violence." (Pen. Code, § 2601, subd. (c)(1)(B).)

[5] The Legislature adopted the *Turner* rule when it amended Penal Code section 2600 to provide in part: "A person sentenced to imprisonment in a state prison may during that period of confinement be deprived of such rights, and only such rights, as is reasonably related to legitimate penological interests." (Pen. Code, § 2600; see *People v. Loyd* (2002) 27 Cal.4th 997, 1008 [119 Cal.Rptr.2d 360, 45 P.3d 296].)

*The* Turner *Test*

■ The *Turner* court developed a four-pronged test (the *Turner* test) to determine whether a prison regulation or policy is reasonably related to legitimate penological interests: (1) whether there is a valid, rational connection between the policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) whether accommodating the asserted right will have an impact on guards, other inmates and allocation of prison resources; and (4) whether the policy is an "exaggerated response" to the prison's concerns. (*Turner, supra*, 482 U.S. at pp. 89–91.)

■ In connection with the first prong of the *Turner* test, a court must find (1) whether the governmental interest is legitimate; (2) whether the interest is neutral; and (3) whether the logical connection between the policy and the interest is close enough to be rational and not arbitrary. (*Turner, supra*, 482 U.S. at pp. 89–90.)

First, we determine whether the policy serves a legitimate governmental interest. Many cases have found that prison safety and security are legitimate penological interests. (See, e.g., *Turner, supra*, 482 U.S. at p. 91; *In re Collins* (2001) 86 Cal.App.4th 1176, 1184–1185 [104 Cal.Rptr.2d 108].) Here, the written materials were used in the validation process for the unquestionably legitimate purpose of suppressing dangerous prison gangs. (See *Thornburgh v. Abbott* (1989) 490 U.S. 401, 415 [104 L.Ed.2d 459, 109 S.Ct. 1874] [protecting prison security is central to all other corrections goals].)

Second, we consider whether the policy is content neutral—that is, whether it " 'further[s] an important or substantial governmental interest unrelated to the suppression of expression.' " (*Thornburgh v. Abbott, supra*, 490 U.S. at p. 415.) In *Thornburgh*, the Supreme Court held that when "prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral.' " (*Id.* at pp. 415–416.) Here, the written materials were targeted in order to suppress dangerous prison gangs, not to target speech, and the policy is therefore content neutral.

Third, we examine whether the regulations are rationally related to that objective. (*Thornburgh v. Abbott, supra*, 490 U.S. at p. 414.) "To show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove that the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future. [Citation.] Moreover, it 'does not matter whether we agree with' the defendants or whether the policy 'in fact advances' the jail's legitimate

interests. [Citation.] The only question that we must answer is whether the defendants' judgment was 'rational,' that is, whether the defendants might reasonably have thought that the policy would advance its interests." (*Mauro v. Arpaio, supra*, 188 F.3d at p. 1060.)

According to the gang expert, BGF affiliates often have materials discussing George L. Jackson and Black August, and these materials are used for indoctrinating new BGF affiliates. Using these materials to validate Furnace as a BGF associate, and as a result, transfer him to the SHU, could further a policy of frustrating prison gang indoctrination and group solidarity. It is rational to conclude that a policy that eliminates gang ideology and indoctrination materials will further the legitimate objective of preserving the safety and security of the institution.

 The second prong of the *Turner* test is whether there are alternative means of exercising the asserted right. "Where 'other avenues' remain available for the exercise of the asserted right [citation], courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.' " (*Turner, supra*, 482 U.S. at p. 90.) In applying this factor, " 'the right' in question must be viewed sensibly and expansively." (*Thornburgh v. Abbott, supra*, 490 U.S. at p. 417.)

In *Turner*, the Supreme Court, in upholding a ban on inmate-to-inmate correspondence, defined the right at issue as the right of expression. (*Turner, supra*, 482 U.S. at p. 93.) Because the inmates were allowed to correspond with noninmates, the Supreme Court found that inmates had an alternative means of exercising their right of expression. (*Id.* at p. 92.) In *Snow v. Woodford* (2005) 128 Cal.App.4th 383 [26 Cal.Rptr.3d 862], the appellate court also defined the right at issue as one of expression. (*Id.* at pp. 392–393.) In that case, the court upheld a regulation that prohibited inmates from possessing pictures of exposed breasts and genitalia but did not ban sexually explicit writings, sexually provocative pictures of clothed persons, or sexually explicit pictures contained in medical texts, art reference books, National Geographic, or books purchased for prison libraries and education programs. "Accordingly, inmates have an alternative means of expression." (*Ibid.*)

In *Thornburgh*, the Supreme Court, in upholding a ban on publications that posed a threat to institutional security, defined the right as the right to receive and read outside publications. (*Thornburgh v. Abbott, supra*, 490 U.S. at p. 418.) The right involved here is similar. Also similar is the limited scope of the policy in question. Furnace has not been denied the right to read all books and newspapers, possess any pictures, or listen to CD's. He retains the right to receive and read non-gang-related materials that do not pose a threat to

institutional security. He therefore has an alternate means of exercising the right to receive and read outside publications.[6]

 The third prong of the *Turner* test asks whether the accommodation of the asserted constitutional right would have a significant negative impact on prison guards, other inmates, or the allocation of prison resources generally. Where the right in question "can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike," we defer to the "informed discretion of corrections officials." (*Turner, supra*, 482 U.S. at pp. 92, 90.) We give "considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." (*Thornburgh v. Abbott, supra*, 490 U.S. at p. 408.) Here, the Department has found that inmates' possession of BGF ideology and inmates' membership in or association with BGF are connected in that the former promotes the latter. Furnace has presented no evidence or argument to refute the Department's findings in this regard. Accordingly, the third prong is met.

The fourth prong of the *Turner* test asks whether the regulation is an exaggerated response to the Department's concerns. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation. [Citation.] By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns. This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. [Citation.] But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." (*Turner, supra*, 482 U.S. at pp. 90–91.) The inmate challenging the regulation has the burden to show there are obvious, easy alternatives to the regulation. (*Id.* at p. 91; *Mauro v. Arpaio, supra*, 188 F.3d at p. 1062.) Furnace has not met this burden.

Accordingly, the regulation meets the four-pronged *Turner* test. Furnace's gang validation, which was based in part on his possession of a book, newspaper article, pictures, and CD, did not violate his First Amendment rights.

---

[6] The record does not indicate that the materials in question here are banned by the Department. It is Furnace's possession of the materials in combination with a direct link to Hugo Pinell that supports his validation. We express no opinion on the question whether the Department could legitimately ban the materials or other literature relating to George L. Jackson, Black August, or the BGF.

## DISPOSITION

The petition for writ of habeas corpus is denied and the order to show cause issued herein is discharged.

Ardaiz, P. J., and Levy, J., concurred.

A petition for a rehearing was denied July 1, 2010, and petitioner's petition for review by the Supreme Court was denied September 22, 2010, S184617. Baxter, J., did not participate therein.